[No. S144515. May 24, 2007.]

In re LEMANUEL C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
LEMANUEL C., Defendant and Appellant.

36

## COUNSEL

Patricia N. Cooney, under appointment by the Supreme Court, for Defendant and Appellant.

Margaret Roberts for Protection and Advocacy, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

David C. Coleman, Public Defender (Contra Costa), and Ron Boyer, Deputy Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Gerald A. Engler and Dane R. Gillette, Assistant Attorneys General, Martin S. Kaye, Michael E. Banister, Catherine A. Rivlin and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—Welfare and Institutions Code[1] section 1800 et seq. sets forth procedures that govern the extended detention of dangerous persons. Section 1800 originally provided, in part, that persons under the control of the Department of Youth Authority[2] could be civilly committed to its control at the time they would otherwise be discharged by statute if they "would be physically dangerous to the public because of [a] mental or physical deficiency, disorder, or abnormality." (Stats. 2003, ch. 4, § 45.) In order to preserve the extended detention scheme's constitutionality, we interpreted the extended detention scheme to "require a finding that the person's mental deficiency, disorder, or abnormality *causes serious difficulty in controlling behavior.*" (*In re Howard N.* (2005) 35 Cal.4th 117, 122 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), italics added.) Here we consider defendant's

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Effective July 1, 2005, the Department of Youth Authority was renamed "the Department of Corrections and Rehabilitation, Division of Juvenile Facilities." (§ 1703, subd. (c).) We refer to the "Youth Authority" because the relevant events occurred in 2004.

claim that his civil commitment under section 1800 is unconstitutional because the petition did not allege, and the trial court did not specifically find, "a serious and well-founded risk" that he "would reoffend" if not committed.

We conclude the current extended detention scheme set forth in section 1800 et seq. satisfies the due process and equal protection clauses of our state and federal Constitutions. The scheme's requirements that (1) a person is " 'physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality' " and that (2) the mental or physical[3] deficiency, disorder, or abnormality "causes [the individual] to have serious difficulty controlling his [or her] dangerous behavior" adequately limit the scheme's applicability to youthful offenders whose mental deficiency, disorder, or abnormality causes them to be physically dangerous to the public if not recommitted. (*Howard N.*, *supra*, 35 Cal.4th at p. 135; see § 1800 et seq.) A further finding that an inability to control behavior results in "a serious and well-founded risk of reoffense" is not required to preserve the scheme's constitutionality. Furthermore, although the adult civil commitment statutes for sexually violent predators (SVP's) and for mentally disordered offenders (MDO's) have different limitations on the types of dangerous behavior that fall within their purview than the extended detention scheme challenged here, there is no equal protection violation because persons committed under section 1800 are not similarly situated to SVP's and MDO's in several significant respects. We therefore affirm the judgment of the Court of Appeal.[4]

## I. FACTUAL AND PROCEDURAL BACKGROUND

When defendant Lemanuel C. was 14, the juvenile court adjudged him to be a ward of the court based on his admission that he sodomized his seven-year-old cousin. Two years later, the court sustained a second allegation that defendant made a false crime report alleging that his roommate had raped him. After defendant violated his probation, the court committed him to the Youth Authority for a maximum term of three years and two months. Before the term expired, the court extended defendant's Youth Authority commitment for two years pursuant to section 1800. Before that two-year extension expired, the district attorney filed a second section 1800 petition to further extend defendant's civil confinement.

---

[3] Since physical deficiencies, disorders, or abnormalities are not at issue in defendant's case, we do not discuss further this aspect of the statutory scheme.

[4] Defendant's extended commitment at issue ended on December 13, 2006. Rather than dismiss the case as moot, we chose to retain the case for decision. We exercise our discretion to decide this otherwise moot case because it raises important issues that are capable of repetition but likely to evade review. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151].)

Using the language of the statute as it then read, the second petition alleged, in pertinent part, that defendant, if discharged from the Youth Authority, "would be physically dangerous to the public because of his mental . . . deficiency, disorder, or abnormality . . . ."

Defendant waived his right to a jury on the second petition. (§ 1801.5.) The trial court heard testimony from defendant's Youth Authority psychologist, Dr. Marcia Asgarian. The court also received into evidence by stipulation the probable cause hearing testimony of Dr. P. Herbert Leiderman, a Youth Authority consulting psychiatrist who conducted a section 1800 evaluation of defendant.

Dr. Leiderman concluded that defendant suffers from a "mental disorder" known as reactive attachment disorder.[5] As a result, defendant has "difficulty in forming social relationships and sees individuals as objects rather than as sentient human beings." Dr. Leiderman also concluded that defendant suffered from "pedophilia." Dr. Leiderman characterized defendant as "an adventitious predator" who is attracted to "youngsters, boys particularly." The psychiatrist added that "whenever circumstances permit, [defendant] takes advantage" of youngsters who are "mentally weaker" and "less able to defend themselves." Dr. Leiderman noted that defendant lacks "cognitive skills for self-reflection which could enable him to develop self-corrective maneuvers and thus avoid potentially dangerous situations." Dr. Leiderman added that defendant admitted engaging in several incidents in the Youth Authority involving impermissible sexual activities with other wards "that, if caught, would have been cited." Dr. Leiderman mentioned that, although defendant described his several sexual misconduct incidents as "consensual," defendant was "beginning to rethink what consensual behavior is" and appeared receptive to a "possible treatment program" in the Youth Authority to work on this issue. Dr. Leiderman concluded, however, that defendant's reactive attachment disorder causes him to pose a danger to the community.

Dr. Asgarian worked with defendant in a Youth Authority group home program designed to help rehabilitate sex offenders through group psychotherapy. She testified that defendant initially seemed motivated and actively participated in weekly group therapy. However, after about eight months, defendant told Dr. Asgarian that he "didn't want to participate any more." Defendant often did not attend the therapy sessions; when he came to the group, he "would shut down," hide his face under his jacket, and refuse to talk. Before he "shut down" completely, defendant indicated that he "would reoffend if he didn't receive appropriate treatment." Dr. Asgarian believed

---

[5] The parties agree that the mental disorder is "reactive attachment disorder," although Dr. Leiderman referred to it as "reactive detachment disorder."

defendant did not make any significant progress towards his sex offending issues during the treatment period from the late fall of 2002 to early 2004.

The court granted the petition, finding beyond a reasonable doubt that testimony and evidence presented at the section 1800 hearing established that defendant would "be a physical danger to the public by virtue of a mental deficiency, disorder, [or] abnormality" and that he "has a serious difficulty in controlling his behavior within the meaning of *Kansas v. Crane* [(2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867]]."[6] The court extended defendant's commitment for an additional two years. The Court of Appeal affirmed the granting of the section 1800 petition. We granted defendant's petition for review.

## II. DISCUSSION

Defendant contends section 1800 violates his right to due process of law because it does not expressly require an allegation in the petition, and a finding by the trier of fact, that there was "a serious and well-founded risk that [he] would reoffend if not committed."

### A. *Background*

■ At the time of defendant's trial, an extended detention under section 1800 required only one finding: that a person "would be physically dangerous to the public because of [a] mental . . . deficiency, disorder, or abnormality . . . ." (Stats. 2003, ch. 4, § 45.) As noted above, in order to preserve the statute's constitutionality, we interpreted section 1800 to require a second finding: that a mental deficiency, disorder, or abnormality causes serious difficulty in controlling the person's dangerous behavior. (*Howard N., supra*, 35 Cal.4th at pp. 131–135.) We then held that the finding of serious difficulty in controlling dangerous behavior "must be alleged in the petition for extended commitment (§ 1800), and demonstrated at the probable cause hearing (§ 1801) and any ensuing trial (§ 1801.5)." (*Howard N., supra*, at p. 135.)[7]

The section 1800 petition here did not allege that defendant had serious difficulty in controlling his dangerous behavior. However, the trial court made

---

[6] *Kansas v. Crane, supra*, 534 U.S. at pages 412–413, held that, as a matter of due process, individuals may be involuntarily committed as sexually violent predators only after there is a finding that, as a result of mental illness, they have serious difficulty controlling their dangerous behavior.

[7] In 2005 and 2006, the Legislature added the phrase "that causes the person to have serious difficulty controlling his or her dangerous behavior." That language now follows the word "abnormality" in section 1800. (Stats. 2005, ch. 110, § 1; Stats. 2006, ch. 538, § 688.) The Legislature amended sections 1801 and 1801.5 (eff. July 21, 2005) to include similar language. (Stats. 2005, ch. 110, §§ 3, 4.)

an explicit finding, beyond a reasonable doubt, to that effect—even though the statute did not yet expressly require such a finding.[8]

■ In resolving the issue whether due process required section 1800 to include an additional finding of serious difficulty in controlling a person's dangerous behavior, we analyzed two decisions of the United States Supreme Court involving civil commitments of sexually violent predators (*Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*); *Kansas v. Crane, supra*, 534 U.S. 407 (*Crane*)) and two of our own decisions interpreting and applying the high court's decisions to California's SVP law (§ 6600 et seq.) (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*); *People v. Williams* (2003) 31 Cal.4th 757 [3 Cal.Rptr.3d 684, 74 P.3d 779] (*Williams*)). In so doing, we concluded that the constitutional principles set forth in those cases apply to all civil commitment schemes, including the extended detention scheme at issue here. (*Howard N., supra*, 35 Cal.4th at pp. 128–132.) We reiterate here that, because "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection" (*Addington v. Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804]; see *Howard N., supra*, 35 Cal.4th at p. 127), the extended detention civil commitment procedures under section 1800 et seq. must comport with due process.

We summarize the holdings in *Hendricks*, *Crane*, *Hubbart*, and *Williams* below before addressing whether an explicit, separate "serious and well-founded risk of reoffense" finding is constitutionally required for a section 1800 extended detention civil commitment.

■ In *Hendricks*, the high court held that the challenged Kansas SVP civil commitment law satisfied due process because the defendant's "admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishe[d] [him] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." (*Hendricks, supra*, 521 U.S. at p. 360.) In so holding, the court noted that it previously had "sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as 'mental illness' or 'mental abnormality . . .' [citations]," and it clarified that, for an involuntary civil commitment, due process requires a showing of dangerousness as well as a showing of a mental disorder linked to a difficulty

---

[8] In light of defendant's pretrial argument that due process required a finding that his mental deficiency, disorder, or abnormality caused "lack of control" of his dangerous behavior and the trial court's explicit finding in language similar to that approved in *Crane*, defendant did not suffer prejudice by the fact that his petition did not allege a serious difficulty in controlling dangerous behavior or by the fact that the court did not make such a determination at the probable cause hearing. (*People v. Hayes* (2006) 137 Cal.App.4th 34, 49–51 [39 Cal.Rptr.3d 747].)

of controlling dangerous behavior, rather than a "finding of dangerousness, standing alone." (*Hendricks, supra,* 521 U.S. at p. 358.)

In *Hubbart,* we upheld our state's SVP law, which allows for a civil commitment of a person who has been convicted of a sexually violent offense if certain conditions are met, including that the person has " 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (§ 6600, subd. (a).)"[9] (*Hubbart, supra,* 19 Cal.4th at p. 1158.) In deciding that our SVP law satisfied due process requirements, we relied on *Hendricks.* We reasoned that our SVP law "establishes the requisite connection between impaired volitional control and the danger posed to the public" because it requires a finding of a mental disorder resulting in dangerousness and links that finding to a finding that the mental disorder caused "the inability to control dangerous sexual behavior." (*Hubbart,* at p. 1158.)

◼ In *Crane,* the United States Supreme Court reconsidered the Kansas SVP law and explained that its decision in *Hendricks* had set forth "no requirement of *total* or *complete* lack of control." (*Crane, supra,* 534 U.S. at p. 411.) The court explained that, to satisfy due process, "[i]t is enough to say that there must be proof of serious difficulty in controlling behavior" that, "when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. [Citations.]" (*Crane, supra,* 534 U.S. at p. 413.)

◼ In *Williams,* we interpreted *Crane* as confirming the principle set forth in *Hendricks* that "a constitutional civil commitment scheme must link future dangerousness to a mental abnormality that impairs behavioral control, while . . . making clear that the impairment need only be serious, not absolute." (*Williams, supra,* 31 Cal.4th at p. 773.) We concluded that "a commitment rendered under the plain language of the [Sexually Violent Predator Act (SVPA)] necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence" (*id.* at p. 777), as required by *Crane,* because "the SVPA requires a diagnosed mental disorder *affecting the person's emotional or volitional capacity* that predisposes the person to commit sex crimes in a menacing degree. (§ 6600, subd. (c).)" (*Williams, supra,* at p. 776.)

---

[9] At the time *Hubbart* was decided, the quoted language of section 6600, subdivision (a)(1) was designated section 6600, subdivision (a). (See Historical and Statutory Notes, 73D West's Ann. Welf. & Inst. Code (2006 supp.) foll. § 6600, pp. 64–65.)

### B. *Due Process*

We now consider whether defendant's civil commitment under section 1800 violates his constitutional right to due process of law because the statute does not expressly require an allegation in the petition, and a finding by the trier of fact, that there was "a serious and well-founded risk" that he "would reoffend" if not committed.

One key condition for an SVP determination in California is that there is "a diagnosed mental disorder that makes the person a danger to the health and safety of others *in that it is likely that he or she will engage in sexually violent criminal behavior*." (§ 6600, subd. (a)(1), italics added.) We agree with the Court of Appeal in the present case that (1) the italicized phrase "modifies the clause, 'that makes the person a danger to the health and safety of others,' " and (2) a person thus is a danger for SVP purposes " 'in that it is likely' [he] would reoffend," i.e., commit another "sexually violent offense" (§ 6600, subd. (a)(1)), and (3) therefore, "the likelihood of reoffending is the very crux of the person's dangerousness to the public" in the context of an SVP determination under section 6600 et seq.

Our recent cases analyzing the meaning of the term "likely" in the context of California's SVP law shed light on whether an explicit, separate finding of a serious and well-founded risk of reoffending is constitutionally required in order to extend defendant's detention under section 1800.

In *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949] (*Ghilotti*), we considered the meaning of the term "likely" in section 6601, subdivision (d), which governs the initiation of SVP proceedings. That section states that a prosecutor may not file an SVP petition unless two mental health professionals conclude that the potential SVP "has a diagnosed mental disorder so that he or she is *likely to engage in acts of sexual violence* without appropriate treatment and custody." (§ 6601, subd. (d), italics added.)

We decided that, in this context, the term "likely" does not mean "more likely than not" and therefore does not require a prediction of a greater than 50 percent chance of reoffending. (*Ghilotti, supra*, 27 Cal.4th at pp. 915–919.) We ruled that an evaluator "must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Id.* at p. 922.)

Citing *Hubbart* and *Hendricks*, we observed that our SVP law "emphasizes the themes common to valid civil commitment statutes, i.e., a current *mental*

*condition or disorder* that makes it difficult or impossible to control volitional behavior and *predisposes* the person to inflict harm on himself or others, thus producing *dangerousness* measured by a high risk or threat of further injurious acts if the person is not confined. [Citations.]" (*Ghilotti, supra,* 27 Cal.4th at p. 920.) We concluded that our SVP law satisfies due process because it is limited in scope to "the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations] . . . ." (*Ghilotti, supra,* 27 Cal.4th at p. 924.)

In *Cooley v. Superior Court* (2002) 29 Cal.4th 228 [127 Cal.Rptr.2d 177, 57 P.3d 654] (*Cooley*), we relied on *Ghilotti* in construing the word "likely" to mean that a potential SVP poses a "serious and well-founded risk" of reoffending in the context of section 6602, subdivision (a). (*Cooley, supra,* 29 Cal.4th at p. 256, italics omitted.) Section 6602, subdivision (a), requires a finding of probable cause that the person named in the SVP petition "is *likely* to engage in sexually violent predatory criminal behavior upon . . . release." (Italics added.)

In *People v. Roberge* (2003) 29 Cal.4th 979 [129 Cal.Rptr.2d 861, 62 P.3d 97] (*Roberge*), we analyzed the word "likely" in the context of section 6600, subdivision (a)(1), which sets forth as a condition for an SVP determination that a person "has a diagnosed mental disorder that makes the person a danger to the health and safety of others *in that it is likely that he or she will engage in sexually violent criminal behavior.*" (Italics added.) Relying on both *Ghilotti* and *Cooley,* we construed "likely" in this context to mean "a *substantial danger,* that is, *a serious and well-founded risk,*" of reoffending. (*Roberge, supra,* 29 Cal.4th at p. 988, italics added.)

■ The "serious and well-founded risk" language derives from our decisions interpreting California's SVP law. Those decisions, and *Roberge* in particular, reveal that a "serious and well-founded risk" of reoffending is merely another way of referring to the necessary finding of future dangerousness *in the context of the SVP law that requires a prior conviction of a sexually violent offense,* not a separate required finding. We are convinced that, in the context of an extended civil commitment under section 1800, the required findings that the defendant, if discharged from the Youth Authority, "would be physically dangerous to the public" because of his mental disorder and that the risk of future dangerousness exists because the mental deficiency causes "serious difficulty in controlling [his] dangerous behavior" (§ 1800) satisfy due process because they establish "the requisite connection between impaired volitional control and the danger posed to the public." (*Hubbart,*

*supra*, 19 Cal.4th at p. 1158.) In other words, due process is satisfied because section 1800 requires a finding of a mental disorder resulting in dangerousness, and it properly links that finding to a second required finding that the mental disorder causes the inability to control dangerous behavior.

In *In re Michael H.* (2005) 128 Cal.App.4th 1074 [27 Cal.Rptr.3d 627] (*Michael H.*), the Court of Appeal reached a different conclusion. There, the court held that, in order to uphold the constitutionality of section 1800 et seq., it was necessary to construe "the statutory scheme to require that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling his or her behavior, *resulting in a serious and well-founded risk of reoffense.*" (128 Cal.App.4th at p. 1080, italics added.) The court reasoned that our holding in *Howard N.* compelled construction of the extended detention scheme to require a "serious [and] well-founded risk of reoffense" finding. It reached that conclusion because it determined that the SVP law's due process requirements apply to the extended detention scheme and because the court believed that cases affirming the constitutionality of the SVP law "have required such a finding." (*Michael H., supra,* at pp. 1090–1091.)

For several reasons, we disagree with *Michael H.* First, as noted above, the extended detention scheme set forth in section 1800 et seq. already includes the requirement that the defendant would be physically dangerous to the public because of a mental deficiency, disorder, or abnormality that causes serious difficulty in controlling behavior. Consequently, the statutory scheme does not require a separate "serious and well-founded risk of reoffense" finding to preserve its constitutionality.

Second, *Michael H.* rests on the unfounded assumption that the SVPA *requires* a separate, explicit finding of a "serious [and] well-founded risk of reoffense" to preserve its constitutionality. To the contrary, the "serious and well-founded risk of reoffense" language found in some California SVP cases merely explains the "likely to engage in sexually violent predatory criminal behavior" component of the *dangerousness* finding required for an SVP commitment.

Both the CALJIC SVP jury instruction (CALJIC No. 4.19) and the current CALCRIM SVP jury instruction (Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 3454) appropriately reflect our understanding of the role that the "serious and well-founded risk of reoffense" language plays in an SVP proceeding. CALCRIM No. 3454 provides, in pertinent part, that to prove an allegation that a person is an SVP, the People must prove, beyond a reasonable doubt, that "1. (He/She) has been convicted of committing sexually violent offenses against two or more victims; [¶] 2. (He/She) has

a diagnosed mental disorder; [AND] [¶] 3. As a result of that diagnosed mental disorder, it is likely that (he/she) will be a danger to the health and safety of others because (he/she) will engage in sexual violent predatory criminal behavior." The instruction goes on to *explain* that "[a] person is *likely to engage in sexually violent predatory criminal behavior* if there is a serious and well-founded risk that the person will engage in such conduct if released into the community." (*Ibid.*) In the same paragraph, the instruction further explains that "[t]he likelihood that the person will engage in such conduct does not have to be greater than 50 percent." (*Ibid.*) The above instruction defines "likely to engage in sexually violent predatory criminal behavior" in terms of a "serious and well-founded risk of such behavior," but the instruction does not require the trier of fact explicitly to make a separate finding of a "serious and well-founded risk of reoffense."

CALJIC No. 4.19 is similar. It provided, in pertinent part, that to prove an allegation that a person is an SVP, the People must prove, beyond a reasonable doubt, that he or she is "a person who, (1) has been convicted of a sexually violent offense against two or more victims for which he or she received a [determinate] sentence and (2) has a diagnosed mental disorder that makes him or her a danger to the health and safety of others in that he or she will engage in sexual violent predatory criminal behavior." (CALJIC No. 4.19.) The instruction went on to explain that the trier of fact "may not find [a person] to be a sexually violent predator based on prior offenses without [relevant] evidence of a currently diagnosed mental disorder that makes [him] [her] a danger to the health and safety of others in that it is likely that [he] [she] will engage in sexually violent predatory criminal behavior." (*Ibid.*)

■ As noted above, the "serious and well-founded risk of reoffense" language found in some SVP cases and reflected in CALCRIM No. 3454 simply explains the "likely to engage in sexually violent predatory criminal behavior" component of the future *dangerousness* finding required for an SVP commitment. Contrary to the analysis in *Michael H.*, we conclude that neither the SVP law nor the section 1800 extended detention scheme requires a separate "serious and well-founded risk of reoffense" finding. We disapprove *In re Michael H., supra*, 128 Cal.App.4th 1074, to the extent it holds otherwise.

■ For all the reasons indicated, we are convinced that an extended detention commitment rendered under section 1800 et seq. includes a determination regarding future dangerousness caused by a person's mental deficiency, disorder, or abnormality and that due process does not require a separate finding of a "serious and well-founded risk of reoffense." We conclude the section 1800 extension scheme satisfies due process because the

defendant's "lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes [him] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal [or section 602[10]] proceedings." (*Hendricks, supra,* 521 U.S. at p. 360.)

### C. *Equal Protection*

Defendant also contends that the extended commitment proceedings under section 1800 violate the equal protection clause of our state and federal Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) In this court, defendant's equal protection argument rests on his belief that it is "easier to civilly commit juvenile offenders than their adult counterparts subjected to the SVPA or Mentally Disordered Offenders Act (MDOA),"[11] because the requirement of future dangerousness is more narrowly "limited or circumscribed by statute" in the MDOA and the SVPA than the requirement of future dangerousness in the extended detention scheme set forth in section 1800.[12]

" 'The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' " (*In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201].) The initial inquiry in any equal protection analysis is whether persons are *similarly situated* for purposes of the law challenged." (*People v. Gibson* (1988) 204 Cal.App.3d 1425, 1438 [252 Cal.Rptr. 56], italics added.)

---

[10] Section 602 sets forth procedures for adjudging minors to be wards of the juvenile court because they have violated laws "defining crime."

[11] A prisoner adjudicated to be an MDO may be civilly committed during and after parole if the following conditions are met: (a) the "prisoner has a severe mental disorder that is not in remission or cannot be kept in remission without treatment"; (b) the "severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime for which the prisoner was sentenced to prison"; (c) the "prisoner has been in treatment for the severe mental disorder for 90 days or more within the year prior to the prisoner's parole or release"; (d) a mental health professional evaluated the prisoner and concluded that criteria (a), (b) and (c) above have been met, and that due to the severe mental disorder, the prisoner "represents a substantial danger of physical harm to others"; (e) the prisoner received a determinate sentence for the crime referenced in (b), and the crime is one from a list of crimes enumerated in subdivision (e). (Pen. Code, § 2962, subds. (a)–(e).)

[12] In the Court of Appeal, defendant contended section 1800 violates equal protection because "it has fewer procedural safeguards than those required to civilly commit an adult SVP or MDO." The Court of Appeal "agree[d] that the adult statutes generally have more procedural safeguards and require more serious predicate offenses for commitment" but properly concluded that there was "no equal protection violation here because persons committed under section 1800 are not similarly situated to SVP['s] and MDO['s] in key respects."

■ The fact that Youth Authority wards committed under section 1800 and adults committed as SVP's or MDO's are considered dangerous due to mental disorders and therefore are subject to commitment for treatment and the protection of the public does not lead to the conclusion that "persons committed under California's various civil commitment statutes are similarly situated in all respects. They are not." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1158 [88 Cal.Rptr.2d 696] (*Buffington*).) Although section 1800 is a civil commitment statute, as are the SVPA and the MDOA, the Legislature enacted the adult civil commitment statutes with different purposes in mind than the purpose of the section 1800 extended detention scheme challenged here.

As we noted in *Cooley*, "the SVPA narrowly targets 'a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated.' [Citation.]" (*Cooley, supra*, 29 Cal.4th at p. 253.) Similarly, the MDOA narrowly targets adult prisoners whose "severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime for which the prisoner was sentenced to prison." (Pen. Code, § 2962, subd. (b).) Therefore, adults civilly committed under the SVPA or the MDOA are labeled "sexually violent predators" or "mentally disordered offenders" based, in part, upon the nature of their prior convictions in addition to their potential for future dangerousness to others.

■ In contrast to the SVPA and the MDOA, section 1800 broadly encompasses all youthful offenders committed to the Youth Authority who, if discharged from that facility, "would be physically dangerous to the public" because of their mental deficiency, disorder, or abnormality. (§ 1800.) Section 1800 does not stigmatize a youthful offender whose detention is extended under its provisions by labeling him or her a certain type of offender. Significantly, section 1800 does not narrowly target specific youthful offenders in the Youth Authority based upon the nature of their sustained allegations that resulted in a Youth Authority commitment. Accordingly, the "serious and well-founded risk of *reoffense*" language defendant argues should be grafted onto section 1800 has no application to the challenged Youth Authority extended detention scheme.

Youth Authority wards are distinctly different from more serious adult offenders who have committed violent or sexually violent crimes. The Legislature may " 'adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified.' [Citation.]" (*Buffington, supra*, 74 Cal.App.4th at p. 1158.) As the Court of Appeal in this case appropriately recognized, "[t]he mere fact that the Legislature has made it more difficult to commit a more serious, adult

offender—especially one who faces the stigma of being declared an SVP [or MDO]—does not give rise to an equal protection violation."

Accordingly, we conclude defendant's equal protection argument is without merit.

### III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.