Filed 3/20/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.J.,<br><br>        Defendant and Appellant. | A137787<br><br>(Contra Costa County<br>Super. Ct. No. J0801378) |

K.J. was committed to the Division of Juvenile Facilities (DJF) after several failed alternative dispositions. His principal contention is that his placement violated the prohibition against ex post facto laws because he was not eligible for a DJF commitment when he was adjudicated a ward of the court, and he was placed there under an amendment to Welfare and Institutions Code section 731 that was enacted after his adjudication. He also argues that the placement order must be reversed because the statutory amendment was not intended to apply retroactively. We conclude that the amendment was intended to be retroactive. We further conclude that application of the amendment to permit commitment of wards like K.J. in the DJF was not an ex post facto violation because there is nothing so punitive in the statute's purpose or effect in K.J.'s case that would warrant our disregard of the Legislature's express intent in enacting it. We therefore affirm the disposition.

1

# I. FACTUAL AND LEGAL BACKGROUND

## A. K.J.'s Case

K.J. was born in July 1995. In May 2008, when he was 12 years old, he molested his five-year-old brother. K.J. said that he had been molested by his father, and did not realize that his father's conduct was wrong. In June 2008, a Welfare and Institutions Code section 602 petition was filed alleging the May 2008 offense.[1] In August 2008, K.J. admitted a lewd act on a child under age 14 (Pen. Code, § 288, subd. (a)), was adjudged a ward, and was put on probation in the custody of his grandparents. In October 2008, his grandparents reported that they could not control him, and he was placed in the Martin's Achievement Place. In June 2010, after sexual activity at Martin's, he was placed at Gateway Residential Programs. In February 2012, after sexual activity at Gateway, he was placed at Teen Triumph, a third residential juvenile sex offender program, where he again engaged in sexual conduct. In August 2012, he was detained in juvenile hall. In October 2012, he admitted violating probation at Teen Triumph.

The case proceeded to a contested disposition. The probation department recommended that K.J. be committed to the DJF. He had "proven himself to be not amenable to treatment in placement," and appeared to be "a serial predatory sex offender." He had "progressed from intimidating a younger resident at Martin's Achievement Place to engage in sexual conduct to . . . more recent incidents of . . . 'persuading' younger . . . vulnerable residents to engage in sexual conduct." Gateway advised that it would not readmit K.J. because "we can not guarantee the safety of our more vulnerable clients if [he] were to return." The department opined that K.J. needed "a long-term juvenile sex offender program in a custodial setting with the [DJF]."

K.J.'s counsel filed a brief arguing that the prohibition against ex post facto laws precluded K.J. from being committed to the DJF. Counsel filed a declaration stating that

---

[1]Unless otherwise indicated, subsequent statutory references are to the Welfare and Institutions Code.

qualified therapists from the San Francisco Forensic Institute and A Step Forward, a Contra Costa County program, were available to provide sex offender treatment at the county's Youthful Offender Treatment Program (YOTP), a locked facility housed in one unit of the juvenile hall. Counsel stated that ten of the 30 rooms at the YOTP housed only one ward.

The department briefed the ex post facto issue, and objected to placing K.J. at the YOTP. The department stated that no sex offenders were housed there, and YOTP staff were not trained to provide sex offender treatment. The department believed that K.J.'s behavior "could place him at risk of physical harm in the YOTP," and threaten the more vulnerable YOTP residents. At the December 2012 dispositional hearing, county counsel noted that K.J. had failed in three residential treatment programs, and reported that all of the other residential programs used by the department were refusing to admit him.

The court followed the department's recommendation and committed K.J. to the DJF for a maximum term of eight years. The judge stated: "I actually have a great concern about this minor. . . . I feel he's a serious predator serial sex offender. . . . I feel he's a danger in the community. And I also feel he's a danger to programs. [¶] . . . [¶] I think he is very dangerous. I don't think there's anything other than [DJF] that would protect the community and have the facilities to rehabilitate him."

B. Realignment Legislation

In 2007, realignment legislation was enacted to transfer greater responsibility for wards to county authorities. (*In re N.D.* (2008) 167 Cal.App.4th 885, 891 (*N.D.*).) "One aspect of [the realignment legislation] was to 'stop the intake [to DJF] of youthful offenders adjudicated for non-violent, non-serious offenses (non-707 b offenses). . . .'" (*In re Greg F.* (2012) 55 Cal.4th 393, 409.) Section 731 was amended to provide that a ward could be committed to the DJF "if the ward has committed an offense described in subdivision (b) of Section 707 and is not otherwise ineligible for commitment to the division under Section 733." (Former § 731, subd. (a)(4); *N.D.*, *supra*, 167 Cal.App.4th at p. 890.) Section 733 was amended to prohibit a DJF commitment if "the most recent offense alleged in any petition and admitted or found to be true by the court is not

described in subdivision (b) of Section 707, unless the offense is a sex offense set forth in paragraph (3) of subdivision (d) of Section 290 of the Penal Code." (Former § 733, subd. (c); *N.D.* at p. 890.) [2] Although this legislation narrowed the class of wards who were DJF eligible, it was "clear that the Legislature intended to preserve the possibility of DJF commitments for violent offenders and sex offenders." (*In re Greg F., supra,* 55 Cal.4th at p. 410.)

C. The *C.H.* Decision and the Enactment of Assembly Bill No. 324

When K.J. was made a ward of the court in 2008 for his violation of Penal Code section 288, subdivision (a), wards with similar adjudications were being placed in DJF. (See § 1752.16.) The inclusion of Penal Code section 288 within the scope of Penal Code section 290.008 (see fn. 2, *ante*) seemed to qualify him for placement. However, our Supreme Court concluded in *In re C.H.* (2011) 53 Cal.4th 94 (*C.H.*) that juveniles found to have violated Penal Code section 288, subdivision (a) were not then eligible for DJF.

*C.H.* held that "[r]ead together, sections 731(a)(4) and 733(c) limit the class of wards who may be committed to the DJF to those wards who (1) have committed an offense described in section 707(b) and (2) whose most recent offense alleged in any petition and admitted or found to be true by the court is listed either in section 707(b) or Penal Code section 290.008(c)." (*C.H.*, *supra*, 53 Cal.4th at p. 102.) K.J.'s violation of Penal Code section 288, subdivision (a) did not satisfy the first prerequisite for a DJF commitment, because it was not a section 707, subdivision (b) offense. (*C.H.*, *supra*, at pp. 98, 102, 108 [discussing the violation of Pen. Code § 288, subd. (a) in that case].) Like C.H., under the statutory scheme at the time of his original commitment, K.J. was not eligible for placement in DJF.

---

[2]Former Penal Code section 290, subdivision (d) (Stats. 2006, ch. 337, § 11, p. 2591, eff. Sept. 20, 2006), currently Penal Code section 290.008 (Stats. 2007, ch. 579, § 16, p. 4811, eff. Oct. 13, 2007), specifies offenses, including violation of Penal Code section 288, which trigger sex offender registration requirements for wards committed to the DJF. Section 733 was amended to refer to Penal Code section 290.008 rather than Penal Code section 290, subdivision (d). (Stats. 2008, ch. 699, § 28, p. 4863.)

In response to *C.H.*, in February 2012 the Legislature passed Assembly Bill No. 324, an urgency measure amending section 731, subdivision (a)(4). (Assem. Bill No. 324 (2011-2012 Reg. Sess.) § 1 (A.B. 324); Stats. 2012, ch. 7, § 1.) As amended, section 731, subdivision (a)(4) authorizes a ward's commitment to DJF when the ward "has committed an offense described in subdivision (b) of Section 707 *or subdivision (c) of Section 290.008 of the Penal Code*, and is not otherwise ineligible for commitment to the division under Section 733." (*Ibid.*, italics added.) A.B. 324 declared: "In order to protect the public by preventing the possible release of juvenile offenders who committed serious or violent offenses or sex offenses, it is necessary that this act take effect immediately." (Stats. 2012, ch. 7, § 4.)

A.B. 324 also added section 1752.16, which provides: "(a) The chief of the Division of Juvenile Facilities, with approval of the Director of Finance, may enter into contracts with any county of this state for the Division of Juvenile Facilities to furnish housing to a ward who was in the custody of the Division of Juvenile Facilities on December 12, 2011, and whose commitment was recalled based on both of the following: [¶] (1) The ward was committed to the Division of Juvenile Facilities for the commission of an offense described in subdivision (c) of Section 290.008 of the Penal Code. [¶] (2) The ward has not been adjudged a ward of the court pursuant to Section 602 for commission of an offense described in subdivision (b) of Section 707. [¶] (b) It is the intent of the Legislature in enacting this act to address the California Supreme Court's ruling in [*C.H.*]." (Stats. 2012, ch. 7, § 3.)

## II. DISCUSSION

A. The Legislature Intended A.B. 324 to be Retroactive

In oral argument, counsel for K.J. challenged the application of A.B. 324 in this case on the basis that the Legislature did not unambiguously express its intention that the amendments be applied to offenders whose adjudications occurred before its enactment. We disagree. As our discussion of the legislative history shows, A.B. 324 was passed as an urgency measure to "address the California Supreme Court's ruling in [*C.H.*]," "[i]n order to protect the public by preventing the possible release of juvenile offenders who

5

committed serious or violent offenses or sex offenses." (Stats. 2012, ch. 7, §§ 3, 4.)  A.B. 324 provided for housing in DJF of wards who, pursuant to *C.H.*, already had their commitment recalled by a court.  (§ 1752.16.)  Moreover, the Legislative Counsel's summary of A.B. 324 states:  "This bill would expand the class of persons who may be committed to the [DJF] to include a ward who has committed a specified sex offense, or who was *previously found* to have committed a specified serious or violent offense or a specified sex offense."  (Italics added.)  The amendments were plainly intended to apply to those wards who had been adjudicated prior to A.B. 324's effective date.

B.  Application of the Section 731 Amendment is Not an Ex Post Facto Violation

(1)  *K.J.'s Argument and Ex Post Facto Principles*

K.J. contends that his commitment to the DJF under section 731, subdivision (a)(4) as amended in 2012 violated the federal and California constitutional prohibitions against ex post facto laws.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)  He argues that an ex post facto violation occurred because the DJF commitment was a more restrictive disposition than authorized for his offense when he was adjudicated a ward.  (See, e.g., *In re W.B.* (2012) 55 Cal.4th 30, 44 [DJF is the "most restrictive placement" for juvenile offenders]; *In re Eddie M.* (2003) 31 Cal.4th 480, 488 [same].)

"[T]wo critical elements must be present for a criminal or penal law to be ex post facto:  it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."  (*Weaver v. Graham* (1981) 450 U.S. 24, 29, fn. and italics omitted.)  A law imposes a prohibited disadvantage if it has "one or more of the following four effects:  it makes criminal acts that were innocent when done; it makes the crime greater or more aggravated than it was when committed; it inflicts a greater punishment for the crime than was available when the crime was committed; or it alters the rules of evidence or the required proof for conviction."  (*In re Robert M.* (2013) 215 Cal.App.4th 1178, 1186 (*Robert M.*); see also *Collins v. Youngblood* (1990) 497 U.S. 37, 41, 43 (*Collins*) [the ex post facto prohibition bars laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts"].)

6

The ex post facto prohibition is intended to ensure that individuals have " 'fair warning' " about the effect of criminal statutes and " 'restricts governmental power by restraining arbitrary and potentially vindictive legislation.' " (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 267.) "The federal and state ex post facto clauses are interpreted identically." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1171 (*Hubbart*).) The ex post facto prohibition has generally been recognized to apply in juvenile wardship proceedings. (*In re Dewing* (1977) 19 Cal.3d 54, 57–58; *In re Melvin J.* (2000) 81 Cal.App.4th 742, 759–760, disapproved on another ground by *In re John L.* (2004) 33 Cal.4th 158, 181, fn. 7 (*John L.*); *In re Dennis C.* (1980) 104 Cal.App.3d 16, 20–22; *In re Valenzuela* (1969) 275 Cal.App.2d 483, 486–487 (*Valenzuela*).)

(2) *Retroactivity*

The retroactivity requirement is satisfied here because section 731 as amended " ' "change[s] the legal consequences of an act completed before [the law's] effective date," *namely the defendant's criminal behavior*.' " (*John L., supra,* 33 Cal.4th at p. 172.) K.J.'s criminal behavior took place before the enactment of A.B. 324, and those statutory changes are being applied to alter the legal consequences of K.J.'s violation of Penal Code section 288, subdivision (a) by making him eligible for a DJF commitment. The People acknowledge that "*C.H.* found that wards like [K.J.] could not be committed to DJF," but argue that A.B. 324 is not being applied retroactively because it "simply reinstated the *status quo ante* that existed before *C.H.*, in that it returned discretion to the juvenile court to commit wards like [K.J.] to DJF." That argument fails because, under *C.H.*, the juvenile court had no discretion to commit wards like K.J. to the DJF under sections 731 and 733 before A.B. 324 was enacted. A.B. 324 is being applied retroactively in this case.

(3) *Punishment*

The remaining question is whether section 731 as amended "inflicts a greater punishment for [K.J.'s] crime than was available when the crime was committed." (*Robert M., supra,* 215 Cal.App.4th at p. 1186.)

7

While it is settled that juvenile wardship laws are subject to ex post facto limitations, those limitations cannot be reflexively applied to prohibit retroactive application of any law that may disadvantage a ward. In *John L.*, for example, the Court concluded that lowering the burden of proof for juvenile probation violations and expanding the evidence admissible to prove such violations were not impermissible ex post facto changes, even though they opened to the door to violation findings that could result in more restrictive placements. (*John L.*, *supra*, 33 Cal.4th at pp. 165–166.)

Moreover, while juveniles have been held to possess constitutional rights at the adjudicatory stage of a delinquency case on the ground that such cases are "comparable in seriousness to a felony prosecution" (*In re Gault* (1967) 387 U.S. 1, 36 [juvenile may be "subjected to the loss of his liberty for years"]; see also *In re Winship* (1970) 397 U.S. 358, 366; *Breed v. Jones* (1975) 421 U.S. 519, 528, 531), wardship proceedings are not criminal cases. Section 203 provides: "An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." (§ 203.) Thus, a juvenile adjudged to be a ward of the court has not been "convicted" of anything. (*In re Bernardino S.* (1992) 4 Cal.App.4th 613, 618.)

In *Hubbart, supra,* 19 Cal.4th 1138, detention designed to protect public safety was recognized as a legitimate non-punitive objective in a civil commitment context. (*Id.* at p. 1173.) *Hubbart* addressed whether commitment of a prisoner under the Sexually Violent Predators Act (§ 6600 et seq.; SVPA) violated the ex post facto prohibition if it was based on sexually violent offenses committed before the SVPA's effective date. "The basic issue raised by [the prisoner was] whether the SVPA inflicts 'punishment' within the meaning of *Collins*, *supra*, 497 U.S. 37, 43." (*Hubbart*, at p. 1171.) Resolution of that issue was guided by the opinion in *Kansas v. Hendricks* (1997) 521 U.S. 346 (*Hendricks*). The *Hendricks* Court "made clear that the Legislature's own characterization of the law plays a critical role in this determination. Courts should 'ordinarily defer' to statements in the legislative record indicating that a measure is not penal in nature." (*Hubbart,* at p. 1171.)

*Hendricks* "held that civil commitment under Kansas's Sexually Violent Predator Act based upon past conduct for which the offender has been convicted and punished does not violate the double jeopardy clause or the ex post facto clause, because such civil commitment does not constitute punishment for purposes of either constitutional provision. The first question considered by the court was 'whether the legislature meant the statute to establish "civil" proceedings. If so, we ordinarily defer to the legislature's stated intent.' [*Hendricks*, *supra*, 521 U.S. at p. 361.] The court found such a legislative intent, adding: 'Although we recognize that a "civil label is not always dispositive," [citation], we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." [Citation.]' (*Ibid.*) The high court concluded the offender had 'failed to satisfy this heavy burden' (*ibid.*), observing that the state 'is not seeking retribution for a past misdeed' (*id.* at p. 362), but is acting to protect the public from 'the dangerously mentally ill.' (*Id.* at p. 363.)" (*People v. Castellanos* (1999) 21 Cal.4th 785, 794–795.)

The *Hubbart* Court similarly concluded that, in enacting the SVPA, our Legislature "intended a nonpenal 'civil commitment scheme designed to protect the public from harm.' " (*Hubbart*, *supra*, 19 Cal.4th at p. 1172.) The prisoner did not meet his " 'heavy burden' " of showing that the law was so punitive in its purpose or effect as to negate the legislative intent. (*Id.* at pp. 1172–1175.) *Hubbart* noted that, under *Hendricks*, a law "enacted amidst concern for the harm caused by mentally disordered sexual predators, and to protect the public by both confining and treating such persons until they were safe to be at large" does not constitute punishment for ex post facto purposes. (*Id.* at p. 1174.) *Hubbart* held that "the SVPA does not 'affix culpability' or seek 'retribution' for criminal conduct," and rejected the prisoner's ex post facto argument. (*Id.* at p. 1175; see also *People v. McKee* (2010) 47 Cal.4th 1172, 1193–1195 (*McKee*) [rejecting an ex post facto challenge to SVPA amendments modifying rules for release from commitment; citing *Hendricks*, *Hubbart*, and the law's "nonpunitive purpose of treatment and public protection"].)

9

Under *Hendricks* and *Hubbart*, whether a wardship statute inflicts punishment for ex post facto purposes turns initially on the Legislature's intent in enacting the law. Legislative intent is not, as K.J. argues in supplemental briefing, irrelevant to our consideration of whether a civil law such as section 731 administers punishment. As we have said, the stated purpose of the section 731 amendment was "to protect the public by preventing the possible release of juvenile offenders who committed serious or violent offenses or sex offenses." (A.B. 324, § 4.) As *Hendricks* and *Hubbart* make clear, such a concern for public safety is not synonymous with a desire to punish. Since the amendment was not intended to be punitive, K.J. must demonstrate that the amendment is so punitive in purpose or effect as to negate its stated intent. (*Hendricks*, *supra*, 521 U.S. at p. 361; *Hubbart*, *supra*, 19 Cal.4th at p. 1172.) In those "limited circumstances," the courts "will consider the statute to have established criminal proceedings for constitutional purposes." (*Hendricks, supra,* at p. 361.) The section 731 amendment "has a rational connection to a nonpunitive purpose." (*McKee*, *supra*, 47 Cal.4th at pp. 1194–1195 [listing this as one factor among others " ' "neither exhaustive nor dispositive" ' " bearing on a law's punitive nature].) K.J. has not met his " 'heavy burden' " of showing, contrary to the legislative intent, that the law is punitive in purpose or effect. (*Hendricks*, *supra*, at p. 361; *Hubbart*, *supra*, 19 Cal.4th at p. 1172.)

Citing section 202, K.J. argues that the section 731 amendment had a punitive purpose apart from its professed intent because "the continued confinement of juvenile offenders did not purport to be aimed at any notion of 'care, treatment, and guidance,' [§ 202, subd. (b)], but solely at providing 'for the protection and safety of the public [§ 202, subd. (a)].' " However, section 202 does not help him.

Section 202, subdivision (b) provides that "[m]inors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." Since this provision mandates appropriate treatment consistent with a ward's best interest, we may presume that the Legislature

10

considered that such treatment would be afforded at the DJF, or anywhere else a ward may be placed. Thus, no intent to punish can be inferred from the Legislature's failure to include treatment as an express purpose of the section 731 amendment allowing DJF commitments.

Our reasoning is supported by the decision in *Robert M., supra*, 215 Cal.App.4th 1178. That case rejected an ex post facto challenge to the retroactive application of section 1752.16, which provides for "housing" at the DJF of wards who had been committed there and had the commitments recalled in accordance with the ruling in *C.H.* (*Robert M.*, at p. 1186.) Section 1752.16, like the statement of intent for A.B. 324, does not expressly refer to treatment at the DJF, but the *Robert M.* court nonetheless assumed that treatment would be provided. The court determined that section 1752.16 did not increase the ward's punishment because it merely "created an additional resource to provide sexual offender treatment" for which he was already eligible, and simply added "a different location" to those previously specified where the treatment could be provided. (*Ibid*.)

K.J.'s case illustrates that, in addition to public protection, the changes effected by A.B. 324 afford wards the opportunity for beneficial treatment. K.J. failed in three residential treatment programs, and no other program used by the department would take him. The county's YOTP did not house sex offenders and none of its staff were trained to provide sex offender treatment. The department was concerned that K.J. would be at a risk of harm if he were housed there. But he could get treatment at the DJF, and he is a serial sex offender who needs treatment. As the juvenile court judge stated: "I don't think there's anything other than [the DJF] that would protect the community and have the facilities to rehabilitate him." (See Seiser & Kumli, Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (2013) § 3.96[6][e][i], p. 3-187 [many wards like K.J. "do not have appropriate treatment options in their home counties"].) Indeed, confinement at DJF may be K.J.'s best chance at rehabilitation.

Section 202, subdivision (b) states that the guidance given a ward "may include punishment that is consistent with the rehabilitative objectives of this chapter," and

11

section 202, subdivision (e) lists DJF commitments among the possible punitive sanctions a ward can receive, along with fines, community service, probation and parole conditions, and commitments to local facilities such as juvenile hall. Thus, a ward like K.J. could be punished in various ways both before and after section 731 was amended, and the amendment merely added another potential punishment on equal statutory footing with other alternatives. To the extent that a DJF commitment "has been regarded in our history and traditions as a punishment" (*McKee*, *supra*, 47 Cal.4th at pp. 1194–1195 [a factor tending to "evince[] a punitive purpose"]), the same is true of the other sanctions authorized under section 202, subdivision (e). Notably, this statute prohibits imposing punishment on wards for retribution, which, if allowed, would raise ex post facto concerns. (*Hendricks*, *supra*, 521 U.S. at p. 362; *Hubbart*, *supra*, 19 Cal.4th at pp. 1172–1173.)

Accordingly, no punitive purpose can be discerned beyond the Legislature's stated objective in amending section 731. This overriding objective of the Legislature appears to have been "in conformity with the interests of public safety and protection," to provide the "care, treatment, and guidance that is consistent with [the ward's] best interest." (§ 202, subd. (b); *In re Charles G.* (2004) 115 Cal.App.4th 608, 614–615 (*Charles G.*) [identifying the two basic aims of juvenile delinquency laws].) Nor has any punitive effect of the amendment been identified in K.J.'s case that would negate the stated intent. (*Hendricks*, *supra*, 521 U.S. at p. 361; *Hubbart*, *supra*, 19 Cal.4th at p. 1172.)

When we consider the possible punitive effect of A.B. 324, the case most closely on point is *Robert M.*, *supra*, 215 Cal.App.4th 1178. The *Robert M.* court concluded that housing of wards at the DJF pursuant to section 1752.16 is not prohibited ex post facto punishment because the statute merely affords another location where authorized treatment can be provided. The court also noted that the ward in that case was at an age where he could be housed in county jail. (§ 208.5 [at age 19, ward may be delivered to the custody of the sheriff]; *Charles G.*, *supra*, 115 Cal.App.4th at p. 613.) "It cannot realistically be argued," the court wrote, "that housing at DJF for the limited purpose of successful completion of the sexual offender program is a greater punishment than a

12

fixed term of commitment to juvenile hall, with housing at the county jail, where the ward has no ability to effectuate his release through completion of a counseling program. Because it does not authorize punishment of a type or duration greater than permitted before its enactment, section 1752.16 is not a prohibited ex post facto law." (*Robert M.*, *supra*, at p. 1186.)

The section 731 amendment allowing DJF commitments, unlike enactment of section 1752.16, provides for confinement of a type and duration different from those previously allowed. As we have acknowledged, a commitment to the DJF has generally been considered the most restrictive placement a ward can receive. Such a commitment "has penal overtones, including institutional confinement with adult offenders . . . ." (*In re Arthur N.* (1976) 16 Cal.3d 226, 237; § 1731.5 [those convicted of specified crimes may under certain conditions be committed to the DJF if they were under age 21 when apprehended] .) But even though the DJF may to a degree be more harsh or restrictive than the "safe and supportive homelike environment" mandated for juvenile hall (§ 851), both commitments involve loss of liberty (§ 207, subd. (a) [juvenile hall is a secure facility]), and the DJF may be the best place and offer the best chance for rehabilitation of serial sex offenders like K.J. The prospect for confinement with adult offenders will also be largely the same in K.J.'s case whether he stays at the DJF or is returned to juvenile hall, because he is now approaching age 19, when he can be transferred from juvenile hall to county jail. (§ 208.5; *Charles G.*, *supra*, 115 Cal.App.4th at p. 613.) For wards in K.J.'s situation, conditions of confinement at the DJF are not sufficiently more onerous than those at juvenile hall that we would conclude the penal effect of the amendment to section 731 negates its nonpenal intent.

As for the duration of confinement, retroactive extension of the term of a ward's potential commitment has been recognized as a prohibited ex post facto penal effect. (*In re Dewing*, *supra*, 19 Cal.3d at pp. 57–58; *In re Dennis C.*, *supra*, 104 Cal.App.3d at pp. 20–22), and there are several ways a DJF commitment can result in longer confinement. While the juvenile court's jurisdiction over a ward generally ends when the ward turns 21 (§ 607, subd. (a)), a ward can be held at the DJF until "the expiration of a two-year period

13

of control or when he or she attains 21 years of age, whichever occurs later" (§ 1769, subd. (a)). However, K.J. will not be held at the DJF beyond age 20 under section 1769, subdivision (a) because he was committed there before his 19th birthday, and he will have been under DJF control for over two years when he turns 21. Under section 607, subdivision (f), the juvenile court retains jurisdiction over a ward committed to the DJF after July 1, 2012 until the ward turns 23, if the ward was found to have committed any of the offenses listed in section 707, subdivisions (b) or (d)(2). (See also § 1769, subd. (c) [wards in that category can be held at the DJF until the later of turning age 23 or expiration of two years of control].) Again, however, those provisions do not apply to K.J. because he was not found to have committed one of the specified offenses.

A DJF commitment, unlike other dispositions, also can render a ward eligible for civil commitment proceedings under section 1800 et seq. Such proceedings can result in continuing confinement if a trier of fact determines beyond a reasonable doubt within two-year intervals that the ward is physically dangerous to the public because of a mental or physical deficiency, disorder, or abnormality that "causes the person to have serious difficulty controlling his or her dangerous behavior." (§ 1801.5]; see also §§ 1800, 1801, 1802.) Back in 1969, *Valenzuela*, *supra*, 275 Cal.App.2d, held that the ex post facto prohibition barred use of section 1800 et seq. against a minor who was committed to the Youth Authority before those statutes were enacted. (*Id.*, at p. 487.) The court was primarily concerned with the indefinite term of the potential confinement: "Valenzuela may remain incarcerated for life. We cannot regard this legislation viewed as a system, as being civil rather than criminal. It is penal in nature and effect." (*Ibid*.)

*Hubbart* has since effectively overruled *Valenzuela* in this regard by rejecting an ex post facto challenge to the SVPA, despite potential indefinite confinement of sexually violent predators. (See *McKee*, *supra*, 47 Cal.4th at pp. 1193–1195.) Concerns for public safety, not punitive intent, underlie commitments under the SVPA and section 1800 et seq., and the constitutionality of section 1800 et seq. has been determined with reference to *Hendricks* and *Hubbart*. (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 41–45, 47; *In re Howard N.* (2005) 35 Cal.4th 117, 127–132, 136.) Ex post facto arguments

14

against civil commitments failed in *Hendricks*, *Hubbart*, and *McKee* in part because the commitments end when the offenders no longer pose a danger. (*McKee, supra,* at pp. 1194–1195 [commitments were not excessive with respect to the nonpunitive purposes to which they were rationally related ].) Similarly, wards committed under section 1800 et seq. cannot be confined beyond two years without proof that they remain a danger, and may be discharged sooner consistent with the protection of the public. (§§ 1802, 1766, subd. (a)(3); see *In re Schmidt* (2006) 143 Cal.App.4th 694, 709.) We thus conclude that K.J. will not be "punished" for ex post facto purposes if he is confined under section 1800 et seq. by virtue of his DJF commitment. Again, it appears that the DJF can most effectively provide the treatment he needs to avoid this very possibility.

The *Robert M.* court distinguished between "[a] commitment to DJF and a commitment to juvenile hall with housing at DJF," finding them to be "distinctly different orders with different results." (*Robert M.*, *supra*, 215 Cal.App.4th at p. 1182.) "First, a ward committed to DJF who has committed any of the wide variety of sex crimes listed in Penal Code section 290.008, subdivision (c), is required to register as a sex offender pursuant to Penal Code section 290, subdivision (b). [Citation.] There is no similar requirement for wards committed to juvenile hall for the same sexual offenses. [Citations.] Second, after a ward is committed to DJF, the decision to release the ward from custody resides with the Juvenile Parole Board, not with the juvenile court that made the commitment. [Citations.] . . . These two factors demonstrate that such a housing order is not merely a semantically different authorization of the same punishment declared impermissible in [*C.H.*]." (*Id.* at pp. 1182–1183.)

Neither of those two factors constitutes impermissible ex post facto punishment. "[T]he requirement that a person register as a sex offender does not constitute punishment for purposes of ex post facto analysis." (*People v. Castellanos, supra,* 21 Cal.4th at p. 788; see also *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1197.) And no reason is given or apparent why an administrative as opposed to judicial determination of K.J.'s rehabilitation is a form of "punishment." We can discern no material distinction for this purpose.

15

We recognize that when the *John L.* court rejected an ex post facto challenge to application of a law that permitted easier proof of probation violations in juvenile cases, it repeatedly noted that the law did not change the range of available placements.  (*John L.*, *supra*, 33 Cal.4th at pp. 166, 176, 184–185.)  The challenged law here *does* change the range of available placements by adding DJF commitments to the juvenile court's options for wards like K.J.  But the *John L.* court's references to the range of available placements are not controlling here because the court was not faced with our issue, nor required to decide whether a change in the placement range is necessarily punitive for ex post facto purposes.  *John L.*'s analysis also was not focused on the situation of any particular ward, and we do not read the case to hold that laws like amended section 731, which increase the range of placements, can *never* be applied to wards whose offenses predate the law's passage.

The amendment to section 731 "does not 'affix culpability' or seek 'retribution' for criminal conduct."  (*Hubbart*, *supra*, 19 Cal.4th at p. 1175.)  K.J. suffered a loss of liberty and the stigma of adjudication long before his commitment to the DJF.  His confinement is not prolonged by section 731.  Rather, section 731 addresses where and how he may be treated.  For these and the other reasons stated, we hold that application of the law here did not impose any unconstitutional, increased punishment on K.J.

Our holding is consistent with those in *In re Carl N.* (2008) 160 Cal.App.4th 423 (*Carl N.*) and *N.D., supra,* 167 Cal.App.4th 885.  Those cases addressed the 2007 amendments to sections 731 and 733 that restricted the offenses for which a DJF commitment could be ordered.  (See *Carl N.*, *supra*, 160 Cal.App.4th at pp. 435–436.)  The wards there had been committed to the DJF before the amendments became effective for offenses that, under the amendments, did not qualify them for the DJF.  They challenged their commitments under the rule, represented by cases such as *In re Estrada* (1965) 63 Cal.2d 740, 745, that, absent a contrary expression of legislative intent, defendants in cases not yet final are to receive the benefit of a law reducing the punishment for their offenses.  (See *N.D.*, *supra*, 167 Cal.App.4th at pp. 890–891.)  The challenges were rejected on the ground that DJF commitments were not punishment for

16

purposes of this rule.  (*Carl N.*, at p. 438 ["[S]ections 731 and 733 . . . do not address punishment or penalties for criminal offenses.  Rather, they govern where a juvenile delinquent may serve time for purposes of rehabilitation."]; *N.D.*, at p. 891 ["The amendments to sections 731 and 733 do not mitigate any punishment, for they do not reduce the amount of time any juvenile offender is confined.  Instead, they limit the places in which juveniles committing certain offenses can be confined"].)

### III.  DISPOSITION

The dispositional order is affirmed.


_____
Siggins, J.


We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.


17

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Lois Haight |
| Counsel for Appellant: | Jonathan Soglin<br>Stephanie Clarke<br>FIRST DISTRICT APPELLATE<br>PROJECT |
| Counsel for Respondent: | Kamala D. Harris, Attorney General<br>Dane R. Gillette, Chief Assistant<br>Attorney General<br>Gerald A. Engler, Senior Assistant<br>Attorney General<br>Eric D. Share, Supervising Deputy<br>Attorney General<br>Christina vom Saal, Deputy Attorney<br>General |