Filed 12/24/14  In re B.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re B.F., a Person Coming Under the Juvenile Court Law. | C072105 |
| THE PEOPLE,  Plaintiff and Respondent,  v.  B.F.,  Defendant and Appellant. | (Super. Ct. No. 12JDSQ2597012) |

After B.F. committed his 10th probation violation, the juvenile court authorized

the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF)

to house B.F. temporarily pursuant to Welfare and Institutions Code section 1752.16,[1] so that B.F. could complete DJF's sexual offender treatment program.

B.F. now contends (1) section 1752.16 violates state and federal constitutional prohibitions against ex post facto laws, and (2) the juvenile court abused its discretion in housing B.F. at DJF because he was not the type of serious juvenile offender who should be housed there.

We conclude (1) section 1752.16 does not violate the prohibition against ex post facto laws, and (2) the juvenile court did not abuse its discretion in housing B.F. at DJF.

We will affirm the judgment.

BACKGROUND

When B.F. was 11 years old, he sodomized an eight-year-old boy and had the boy orally copulate him on multiple occasions.[2] B.F. admitted an allegation in a section 602, subdivision (a) petition that he engaged in lewd or lascivious conduct with a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)

The juvenile court declared B.F. a ward of the court and placed him in the home of his mother and stepfather under the supervision of the Shasta County Probation Office (probation). Among other things, the juvenile court ordered B.F. to complete a recognized sexual offender treatment program; participate in a mental health treatment plan; abide by the terms of his contract and safe plan; obey the direction of his parents; abide by all school regulations and orders; not contact any child under the age of 13 years unless accompanied by a responsible adult who is approved by probation; and not possess

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] We granted B.F.'s motion to take judicial notice of the appellate record, filings, and opinion in Third District Court of Appeal, case No. C067549, in which B.F. appealed the January 13, 2011 disposition order committing him to DJF.

pornographic materials. The juvenile court set the maximum period of confinement at eight years.

B.F. violated probation several months later by having contact with a 10-year-old boy without adult supervision and going outside the line of sight of an approved adult. B.F.'s mother said he refused to obey her directions, was uncontrollable, and posed a danger to his siblings. The juvenile court continued B.F. as a ward, placed him at home under the supervision of probation, and continued the terms and conditions of the January 25, 2006 order. In addition, the juvenile court committed B.F. to juvenile hall for 20 days and ordered him to take his medications.

B.F. violated probation a second time by using sexually explicit language at school in December 2006, resulting in his suspension from school, and willfully going outside the line of sight of an approved adult on two occasions in January 2007. Probation reported B.F. had threatened suicide and his parents could not control him. Additionally, B.F. admitted accessing pornography on the home computer and taking his mother's bras and dresses and wearing them while masturbating. B.F.'s therapist said B.F. did not take therapy seriously. B.F.'s psychiatrist reported B.F. suffered from severe Tourette's disorder, mood instability, aggression, and obsessive sexual compulsions. She recommended placing B.F. in a residential or group home for treatment for "sexual disturbances of thought and compulsion." The juvenile court continued B.F. as a ward under the previous terms and conditions of probation. The juvenile court removed B.F. from his home and placed him at Remi Vista Group Home in Redding to complete its juvenile sexual offender rehabilitation treatment program. The juvenile court ordered that B.F. not run away from the group home and obey the direction of the group home staff.

B.F.'s progress at Remi Vista Group Home was initially reported to be fair but later poor, with incidents of anger and frustration, erratic and attention-seeking behaviors, and sexual contact with two housemates. B.F.'s progress in therapy was "slow."

B.F. violated probation a third time by engaging in numerous instances of inappropriate sexual contact, including oral copulation, with another boy in May 2008. The juvenile court found B.F. violated its previous orders, continued him as a ward and committed him to juvenile hall for 16 days. The juvenile court ordered home furloughs terminated and reinstated probation on the terms and conditions previously ordered.

B.F. returned to Remi Vista Group Home, but on July 29, 2008, he was placed on a section 5150 hold, which involves taking a person into custody for up to 72 hours for assessment, evaluation, and crisis intervention if the person, as a result of a mental health disorder, is a danger to others or himself. Probation reported B.F. was unable to maintain appropriate behavior at Remi Vista Group Home because of medication changes. B.F. was detained at juvenile hall until his medications were evaluated. Placement at Remi Vista Group Home was terminated in August 2008, because B.F. required a higher level of care for his medication and mental health issues.

B.F. remained in juvenile hall pending placement until October 2008. His behavior at juvenile hall was erratic, and he received numerous special incident reports, including reports for disrespectful conduct toward staff and self-injury.

B.F. was next placed at Silverlake Group Home in Yucaipa. Silverlake Group Home closed for reasons unrelated to B.F., and B.F. was returned to juvenile hall a month later.

B.F. was then placed at Sweeney Youth Homes in Santa Maria. He displayed erratic, disruptive, and non-cooperative conduct at Sweeney Youth Homes, and he ran away from that group home, although he contacted his probation officer to turn himself in. Running away from Sweeney Youth Homes resulted in B.F.'s fourth probation violation. It was alleged that Sweeney Youth Homes terminated B.F.'s placement because B.F. ran away from the group home and because of his "blatant failure to respond to the offered treatment." The juvenile court found B.F. violated its prior order and referred B.F. for psychological evaluation. While detained at juvenile hall, B.F.

4

engaged in disrespectful, defiant, and disruptive conduct and received seven citations, a special incident report, numerous log notes, and the loss of two furlough opportunities.

Dr. Boyle interviewed B.F. in December 2008 and January 2009. He performed a psychological evaluation of B.F. in 2005. Dr. Boyle diagnosed B.F. with bipolar II disorder, attention deficit hyperactivity disorder (ADHD), combined type, and Tourette's disorder. Dr. Boyle recommended that the juvenile court order out-of-home placement with a significant degree of structure, sexual offender treatment, and a medication evaluation. Dr. Boyle opined B.F. was at moderate risk to reoffend. The juvenile court continued B.F. as a ward and imposed the previous terms and conditions of probation.

B.F. was next placed at Trinity Ukiah Group Home. He was transferred to Trinity Sacramento when Trinity Ukiah closed.

B.F. violated probation a fifth time in September 2009 when he failed to behave in a safe manner, engaged in daily defiance and disrespect toward other residents, refused to take his medication on five occasions, and engaged in unsafe horseplay, resulting in his termination from Trinity Sacramento. The juvenile court found B.F. violated its prior order, continued B.F. as a ward under the terms and conditions of the prior orders, and detained him at juvenile hall pending placement in a foster or group home. Nevertheless, the juvenile court gave probation discretion to furlough B.F. for purposes of family reunification. B.F. did well in juvenile hall and on home furloughs for a period of time.

Probation had difficulty finding an appropriate placement for B.F. and explored out-of-state placement. B.F. was placed with foster parents with a plan to eventually transition him back to his mother's home. Arrangements were made for local services.

B.F.'s mother found pornographic material on B.F.'s Play Station portable video game during a furlough to her home in November 2009. B.F. also had problems at school. In addition, he ordered sexually explicit movies from a cable company in December 2009, while on furlough at his mother's home, resulting in his sixth probation violation. The juvenile court continued B.F. as a ward of the court under the probation

5

terms and conditions previously imposed, prohibited him from having any electronic device, and ordered him to pay restitution to his mother and to complete eight days of juvenile work program.

Another section 602, subdivision (a) petition alleged that on January 25, 2010, B.F. told another student he would "kick his ass," hit the student, refused to follow the directions of school staff, and threatened to damage school property and staff vehicles. He also allegedly committed battery upon Doug S. on January 26, 2010. The section 602 petition was later dismissed.

B.F. violated probation a seventh time when he possessed a knife at school on February 17, 2010. Probation reported that B.F.'s foster parents had difficulty controlling B.F., B.F. had problems at school, and he had problems during home visits. His mother was reluctant to let him return to her home. The juvenile court continued B.F. as a ward of the court under the previously imposed terms and conditions of probation and detained him in juvenile hall pending placement in a foster or group home. At juvenile hall B.F. continued fighting, using racial slurs, failing to obey directions from staff and committing vandalism. He also threatened to hit another minor and he received four citations for negative behavior at school.

B.F. committed his eighth probation violation when he struck a minor in the back of the head on April 10, 2010. Probation recommended commitment to DJF. Probation said DJF was the best in-state alternative that could meet B.F.'s needs; it had a 12-step sexual behavior treatment program that could provide individualized treatment to accommodate wards with mental health issues, and it could provide the structure and supervision B.F. needed to address his behavioral problems.

The juvenile court had exhausted local services and facilities, but it did not commit B.F. to DJF. Instead, it placed B.F. in the Lakeside Academy sexual offender treatment program in Michigan under the previous terms and conditions of probation.

Probation reported B.F.'s progress at Lakeside Academy was fair to poor. There were incidents where B.F. yelled at his peers, threatened staff, and attempted to assault staff. B.F. reportedly "put forth minimal effort in the program with his participation in the groups and counseling offered."

B.F. committed his ninth probation violation when he engaged in verbal and physical conduct toward his peers and staff at Lakeside Academy which resulted in critical incident reports and ultimately his termination from the program. Probation again recommended committing B.F. to DJF.

Following a contested hearing, the juvenile court sustained the allegations of the probation violation petition. The juvenile court found no alternative service was available to B.F., B.F. was a danger to himself and the community, and B.F. would benefit from the reformatory discipline or other treatment provided by DJF. The juvenile court, therefore, ordered B.F. committed to the custody of DJF for the maximum term of confinement of eight years, less credit for days served. The commitment was based on the 2006 adjudication that B.F. violated Penal Code section 288, subdivision (a). The juvenile court recognized B.F. did not commit an offense listed in section 707, subdivision (b), but determined, pursuant to the former version of section 733, subdivision (c), that B.F. could be committed to DJF because he committed an offense described in Penal Code section 290.008, subdivision (c). The juvenile court requested that B.F. be considered for programming related to sexual offender treatment.

B.F. appealed from the commitment order. This court concluded the juvenile court lacked authority to commit B.F. to DJF under the former versions of sections 731, subdivision (a)(4) and 733, subdivision (c) because B.F. was not adjudged to have committed an offense enumerated in section 707, subdivision (b). This court reversed the juvenile court's commitment order and remanded for further proceedings regarding placement. (*In re B.F.* (Oct. 17, 2012, C067549) [nonpub. opn.].) A remittitur issued on December 18, 2012. However, while the matter was pending in this court, B.F. moved

7

the juvenile court to recall his commitment to DJF pursuant to *In re C.H.* (2011) 53 Cal.4th 94. The juvenile court granted the motion but retained the prior placement orders.

The juvenile court continued the then 18-year-old B.F. as a ward under the previous terms and conditions of probation, and detained him in juvenile hall pending placement in a suitable group home. The juvenile court again gave probation discretion to grant B.F. furloughs for home visits.

Probation explored different placements for B.F., including living with his mother and placement in an adult board and care or transitional housing program. Probation also investigated an appropriate sexual offender treatment program for B.F. B.F. was furloughed for home visits.

During a furlough to his mother's home on April 15, 2012, B.F. became upset with the family dog and shot it with a BB gun, causing a wound which bled. B.F.'s mother also reported B.F. was increasingly demanding and displayed impatience.

On April 17, 2012, a search of B.F.'s room at juvenile hall yielded five pages of pornographic photographs hidden in a tear in B.F.'s mattress. B.F. admitted he obtained the pornography from another inmate while at DJF, retrieved the pornography from a box containing his belongings in his mother's garage while on furlough, and smuggled the pornography into juvenile hall in his rectum. This was B.F.'s 10th probation violation. He admitted the allegations in a probation violation petition and the juvenile court sustained the petition.

Probation recommended B.F. be temporarily housed at DJF for a period not to exceed his 21st birthday in order to complete his treatment program. Probation said B.F.'s recent conduct indicated he posed a risk to the community and he desperately needed treatment for "anger and sexual behaviors." Probation also noted B.F.'s mother was uncomfortable with B.F. living with her because of his reemerging negative

behaviors.  Probation recommended B.F. be housed in a structured environment from which he could not be terminated, allowing him to receive needed treatment.

A dispositional hearing was held on June 21, 2012.  B.F. testified DJF had a good program and he made a lot of progress with the doctor he saw at DJF, but his progress in treatment was slow.  He said other juveniles "messed with" him, cussed at him, and threatened him at DJF because he was a sexual offender.  He had trouble focusing on his schoolwork and his ticks worsened because he was nervous and afraid of being assaulted.  He could not go to group counseling because he was stressed and getting sick.  B.F. admitted he got in fights before he was committed to DJF, and he had been in fights in juvenile hall in the prior four months.  But he denied he was a danger to his siblings or the community.  He said he got in trouble due to changes in his family that caused him stress and things that were going on at juvenile hall.  He said he had bad impulse control when he was on furloughs.  He said he shot the family dog out of anger and also curiosity.  B.F. wanted to participate in outpatient therapy while living at home or participate in a sexual offender treatment program and meet with a therapist once a week while housed at the main jail.

B.F. called two witnesses who testified B.F. had matured after he returned to juvenile hall from DJF.

After taking evidence and listening to argument, the juvenile court found the time B.F. spent at DJF had a positive effect on B.F.  The juvenile court said bringing pornography into juvenile hall and the act of violence against the family dog were "exceptionally concerning" with regard to B.F.'s welfare and the welfare of the public.  The juvenile court concluded DJF offered beneficial treatment therapy and structure which B.F. obviously needed.  It determined that although B.F. had gained insight into his problem with impulse control, B.F. still could not control his impulses.  However, the juvenile court appointed Dr. Boyle to assess B.F.'s level of maturity, current ability to control his impulsiveness, and current level of potential dangerousness, taking into

9

account B.F.'s developmental changes since the last evaluation in 2009. The juvenile court also asked Dr. Boyle to evaluate whether DJF provided the type of treatment environment that would benefit B.F. and whether there was a placement outside DJF that would be safe for the public and beneficial for B.F.

Dr. Boyle confirmed B.F.'s prior diagnoses of bipolar disorder, ADHD, and Tourette's disorder. Dr. Boyle also diagnosed B.F. with conduct disorder. Dr. Boyle's report contained information about the termination of B.F.'s prior placements for conduct including fighting. Dr. Boyle said B.F. lacked "ongoing ability to engage in behavioral change in situations dealing with general impulsivity and his sexual impulses." He noted B.F. had yet to successfully complete a sexual offender treatment program. Dr. Boyle said B.F.'s recent impulsivity and acting out suggested he was not ready for a less restrictive environment. He opined B.F. had a moderate to high risk to reoffend. Dr. Boyle recommended B.F. be returned to DJF and complete its sexual offender treatment program before being considered for a less restrictive placement.

Dr. Ray H. Carlson assessed B.F.'s potential for sexual reoffense upon the request of B.F.'s counsel. Dr. Carlson diagnosed B.F. with Tourette's disorder, ADHD, and mood disorder. He ruled out bipolar disorder as a diagnosis. Dr. Carlson said B.F. had an above-average risk of reoffending based on one assessment instrument, but the elevated risk was mostly due to his "past general acting out and not to high levels of sexual perpetration." Dr. Carlson opined B.F. will not necessarily sexually reoffend. He said B.F. was more likely to act out impulsively in nonsexual ways. Dr. Carlson opined smuggling pornography into juvenile hall was not a sexual offense; rather, it was related to lack of judgment, defiance, and lack of impulse control. Dr. Carlson said B.F. will likely need psychological treatment. He said if B.F. resided in the community, he would need a lot of support to help him establish routines, maintain emotional stability, and learn basic life skills. Dr. Carlson did not make a recommendation about where B.F. should be placed.

10

B.F.'s counsel argued it was in the best interest of B.F. and society for B.F. to learn how to function in a nonstructured setting. She argued B.F. needed a treatment program that focused on mental health, not sexual reoffense, and DJF was not a mental health facility.

The juvenile court held a further dispositional hearing on August 9, 2012. It considered probation's report and the reports of Dr. Boyle and Dr. Carlson. The juvenile court expressed its concern about B.F.'s impulse control issues, including his history of fighting. It had tried less restrictive alternatives for B.F., but those options did not work. The juvenile court was concerned B.F. would probably get caught up in the adult criminal justice system without the structured programs DJF offered. The juvenile court said the structure at DJF had helped B.F. mature, the structured therapeutic programs at DJF were not available "on the outside," and B.F. would benefit from the sexual offender treatment program provided by DJF. The juvenile court believed a less restrictive placement would not work for B.F., pointed out DJF offered mental health services and other services to help with reintegration into the community, and noted stress was not uncommon to any of B.F.'s prior placements.

The juvenile court continued B.F. as a ward of the court under the previously imposed terms and conditions of probation. It ordered B.F. temporarily housed at DJF pursuant to section 1752.16 for a period not to exceed his 21st birthday. B.F. seeks review of that disposition order.

DISCUSSION

I

B.F. contends section 1752.16 violates state and federal constitutional prohibitions against ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)[3]

---

[3] B.F. initially asserted in his appellate opening brief that it was not clear whether the juvenile court recommitted him to DJF or simply ordered him temporarily housed there.

11

Section 1752.16 provides, in relevant part: "(a) The chief of the Division of Juvenile Facilities, with approval of the Director of Finance, may enter into contracts with any county of this state for the Division of Juvenile Facilities to furnish housing to a ward who was in the custody of the Division of Juvenile Facilities on December 12, 2011, and whose commitment was recalled based on both of the following: [¶] (1) The ward was committed to the Division of Juvenile Facilities for the commission of an offense described in subdivision (c) of Section 290.008 of the Penal Code [(specified sex offenses)]. [¶] [and] (2) The ward has not been adjudged a ward of the court . . . for commission of an offense described in subdivision (b) of Section 707 [(serious or violent offenses)]. [¶] (b) It is the intent of the Legislature in enacting this act to address the California Supreme Court's ruling in *In re C.H.* (2011) 53 Cal.4th 94."

Assembly Bill No. 324, which added section 1752.16 and amended sections 731 and 733, became effective on February 29, 2012. (Stats. 2012, ch. 7, §§ 1-3.) The amended statutes make a ward who admits or is adjudicated of violating a statute listed in Penal Code section 290.008, subdivision (c) eligible for DJF commitment. (Stats. 2012, ch. 7, §§ 1-2.) In comparison, under *In re C.H., supra,* 53 Cal.4th 94, a juvenile court could not commit to DJF a ward who, like B.F., was adjudged to have violated Penal Code section 288, subdivision (a) (lewd or lascivious act with a child under the age of 14 years) because while it is a Penal Code section 290.008, subdivision (c) offense, Penal Code section 288, subdivision (a) is not an offense listed in section 707, subdivision (b). (*In re C.H., supra,* 53 Cal.4th at pp. 99, fn. 3, 102, 108.)

Assembly Bill No. 324 added section 1752.16 to address wards otherwise entitled to release from DJF under *In re C.H.* (*In re Edward C*. (2014) 223 Cal.App.4th 813, 824.) The bill analysis prepared for the Senate Committee on Public Safety states:

---

But in his appellate reply brief he conceded that the juvenile court did not commit him to DJF but instead ordered him housed at DJF pursuant to section 1752.16. Accordingly, B.F. said he would limit his first contention to the ex post facto argument.

12

"There are about 65 DJF wards committed to DJF . . . for a sex crime not described in [] section 707[, subdivision] (b). This bill would allow for these wards to continue to be housed in DJF until they reach their maximum age of jurisdiction (21 years) . . . ." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 324 (2011-2012 Reg. Sess.) as amended Feb. 7, 2012, p. 6.) There was concern that if Assembly Bill No. 324 was not passed, the sexual offender treatment those wards were receiving would be disturbed, and most counties would be ill-prepared to house and treat those wards locally. (*Id.* at pp. 5, 9.) The Legislature passed Assembly Bill No. 324 as urgency legislation "to protect the public by preventing the possible release of juvenile offenders who committed serious or violent offenses or sex offenses . . . ." (Stats. 2012, ch. 7, § 4.)

California and federal prohibitions against ex post facto laws are interpreted identically. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 295-297.) The prohibition against ex post facto laws assures "that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. [Citations.] The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." (*Weaver v. Graham* (1981) 450 U.S. 24, 28-29 [67 L.Ed.2d 17, 23], disapproved on another point in *California Dept. of Corrections v. Morales* (1995) 514 U.S. 499, 506, fn. 3 [131 L.Ed.2d 588, 595, fn. 3].) Ex post facto limitations apply to juvenile wardship laws. (*In re K.J.* (2014) 224 Cal.App.4th 1194, 1203.)

Two essential elements must be present for a law to be ex post facto. (*John L. v. Superior Court* (2004) 33 Cal.4th 158, 172.) First, the law must be retroactive. (*Ibid.*) B.F. contends section 1752.16 is retroactive for ex post facto purposes because it changed the legal effect of his 2006 adjudication under Penal Code section 288, subdivision (a). The Attorney General agrees that section 1752.16 is retroactive.

A law is retroactive within the meaning of ex post facto jurisprudence when it applies to events occurring before its enactment or when it changes the legal consequences of acts completed before its effective date. (*Weaver v. Graham, supra,* 450

13

U.S. at pp. 29, 31 [67 L.Ed.2d at p. 24]; *John L., supra*, 33 Cal.4th at p. 172 ["[T]he operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is criminal conduct committed before the disputed law took effect."].) Section 1752.16 is retroactive because it applies to wards committed to DJF and whose commitment was recalled under *In re C.H.* prior to the effective date of Assembly Bill No. 324. (*In re Robert M.* (2013) 215 Cal.App.4th 1178, 1185-1186; *In re K.J.*, *supra*, 224 Cal.App.4th at p. 1203 [section 731, as amended by Assembly Bill No. 324, is retroactive because it alters the legal consequences of the crime for which the ward was committed to DJF].)

Second, for a law to be ex post facto, it must have at least one of the effects described in *Calder v. Bull* (1798) 3 U.S. 386 [1 L.Ed. 648]. (*John L., supra*, 33 Cal.4th at p. 172.) An ex post facto law (1) makes an action, done before the passing of the law and which was innocent when done, criminal and punishes such action; (2) aggravates a crime or makes it greater than it was when committed; (3) changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed; or (4) alters the legal rules of evidence and receives less or different testimony than the law required at the time of the commission of the offense in order to convict the offender. (*John L., supra*, 33 Cal.4th at p. 172, fn. 3; *Calder v. Bull, supra,* 3 U.S. at p. 390 [1 L.Ed. at p. 650].) B.F. contends this case involves the third category, that section 1752.16 imposes a greater punishment for his crime than was available when the crime was committed.

"The ex post facto clause regulates increases in the ' " 'quantum of punishment.' " ' [Citation.] Although no universal definition exists [citation], this concept appears limited to substantive measures, standards, and formulas affecting the time spent incarcerated for an adjudicated crime. For example, an ex post facto violation occurs where laws setting the length of a prison sentence are revised after the crime to contain either a longer mandatory minimum term [citation], or a higher presumptive

14

sentencing range [citation]. Impermissible increases in punishment also have been found where a new postcrime formula for earning gain-time credits postpones an inmate's eligibility for early release [citation], or where retroactive cancellation of overcrowding credits requires reimprisonment of an inmate who has been freed." (*John L., supra*, 33 Cal.4th at pp. 181-182.)

Here, section 1752.16 does not increase the length of confinement in comparison with what was permissible before the effective date of Assembly Bill No. 324. (§§ 726, subd. (d), 731, subd. (c), 1752.16; cf. *In re Edward C., supra*, 223 Cal.App.4th at p. 826 [section 731, as amended by Assembly Bill No. 324, does not amount to greater punishment for purposes of the ex post facto clauses because it does not increase the time a ward must spend in custody].) Both before and after the enactment of section 1752.16, the juvenile court set the maximum term of confinement at eight years.

In addition, both before and after the enactment of section 1752.16, the juvenile court had authority to order the care, treatment and guidance of wards consistent with their best interest and appropriate for their circumstances while holding them accountable for their behavior. (§ 202, subd. (b).) The juvenile court's authority to make any reasonable orders for the care, supervision, medical treatment, conduct, maintenance, and support of the minor and to order a ward to participate in a program of professional counseling as arranged and directed by the probation officer is likewise unchanged. (§§ 727, subd. (a), 731, subd. (a)(3); Stats. 2010, ch. 178, § 98; Stats. 2012, ch. 130, § 2; Stats. 2007, ch. 257, § 2, p. 2814; Stats. 2012, ch. 7, § 1; Cal. Rules of Court, rule 5.790(f).) Further, the prospect of confinement with adult offenders is the same for wards like B.F., who is now over 19 years old and can be transferred to county jail. (§ 208.5.) Under the present circumstances, where the juvenile court determined that the ward would benefit from DJF's sexual offender treatment program and less restrictive alternatives had failed, section 1752.16 does not constitute an increase in punishment for ex post facto purposes as applied to B.F. (Cf. *In re Robert M., supra*, 215

15

Cal.App.4th at p. 1186 [section 1752.16 merely creates an additional resource for the delivery of sexual offender treatment; that this resource was in a different location than the existing local programs does not constitute an increase in punishment]; *In re Edward C., supra*, 223 Cal.App.4th at p. 826 [section 731, as amended by Assembly Bill No. 324, does not constitute an increase in punishment for ex post facto analysis; it merely governs where a ward may serve time for purposes of rehabilitation].)

B.F. argues the juvenile court's August 9, 2012 dispositional order had the effect of reimposing the same restrictions on his liberty that the order committing him to DJF imposed. But a commitment to DJF is different from housing at DJF for the purpose of completing a sexual offender treatment program. (*In re Robert M.*, *supra*, 215 Cal.App.4th at p. 1182.) As B.F. acknowledges, a ward committed to DJF is subject to sexual offender registration. There is no similar requirement for wards subject to a housing order. (*Ibid.*) The Juvenile Parole Board decides whether a ward committed to DJF will be released from custody. (*Ibid.*) By contrast the decision to release a ward subject to a housing order remains with the juvenile court. (*Ibid.*) And the juvenile court told B.F. the length of his stay at DJF depended on how he participated in the DJF program.

While B.F. describes DJF as a "hostile" environment, there is no evidence in the record that DJF was a more hostile environment than juvenile hall. B.F. complained about being threatened and picked on by other kids at DJF. But he had the same complaints about juvenile hall. He got into fights in juvenile hall. And despite placement in different sexual offender treatment programs, B.F. had yet to complete any sexual offender treatment program in the six years he had been on probation. In contrast, B.F. said DJF had a good treatment program and he learned a lot during his time there. After considering all the evidence, the juvenile court found B.F. would benefit from the structured and intensive therapeutic programs offered at DJF. B.F. has not established his claim that returning him to DJF "will significantly [detrimentally] impact his mental

16

health and physical safety" in comparison with housing at juvenile hall. And he has not demonstrated that as applied to him, section 1752.16 increased the quantum of punishment for his 2006 adjudication and is, therefore, an ex post facto law.

II

B.F. also claims the juvenile court abused its discretion in housing B.F. at DJF because he was not the type of serious juvenile offender who should be housed there.

The juvenile court must consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor in all deliberations pursuant to the juvenile court law (§§ 200 et seq.). (§ 202, subd. (d).) "Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of [the juvenile court law]." (§ 202, subd. (b).) "Punishment" means the imposition of sanctions, including limitations on the minor's liberty imposed as a condition of probation. (§ 202, subd. (e).) A juvenile court must liberally construe the juvenile court law to carry out these purposes and review the circumstances of the minor's case each time the minor appears for a dispositional hearing. (§ 202, subd. (a); *In re Kazuo G.* (1994) 22 Cal.App.4th 1, 5 [" '[T]he court is required to examine the entire dispositional picture whenever the minor comes before the court for disposition.' "].) "If a minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor under the jurisdiction of the juvenile court as a consequence of delinquent conduct when those goals are consistent with his or her best interests and the best interests of the public. When the minor is no longer a ward of the juvenile court, the

17

guidance he or she received should enable him or her to be a law-abiding and productive member of his or her family and the community." (§ 202, subd. (b).)

In determining the appropriate disposition for B.F. after the filing of the 10th probation violation petition, the juvenile court considered the report from probation, the assessments of the court-appointed psychiatrist and a psychiatrist selected by B.F., and a letter from B.F. to the juvenile court. Probation recommended housing B.F. at DJF while he completed his treatment. Dr. Boyle made the same recommendation. The juvenile court also considered testimony from B.F. and two witnesses B.F. called attesting to his improved conduct at juvenile hall. The juvenile court recognized the purposes of the juvenile court law which it must effectuate. And it took into consideration B.F.'s history, his consistently poor performance at prior placements and on furlough, his continuing problems with impulse control and fighting, his need to successfully complete sexual offender treatment, his observable maturity after spending time at DJF, his recent acts of violence against the family dog and smuggling pornography into juvenile hall, and that B.F. could be subject to criminal prosecution as an adult if he did not complete treatment.

The record supports the juvenile court's concern regarding B.F.'s history of physical aggression. Most recently, B.F. shot the family dog with a BB gun causing the dog to bleed. The record also shows ongoing issues with regard to sexual behavior, supporting the juvenile court's disposition. B.F. admitted committing a lewd and lascivious act upon an eight-year-old boy when B.F. was 11 years old. Dr. Boyle opined in 2005 that B.F. was at moderate to severe risk of reoffending. Probation reports filed with the juvenile court when B.F. was 12 years old said B.F. admitted accessing pornography on the home computer and taking his mother's bras and dresses and wearing them while masturbating. B.F.'s psychiatrist recommended B.F. receive treatment for "sexual disturbances of thought and compulsion." When he was 13 years old, B.F. reportedly had sexual encounters with two housemates at Remi Vista Group Home. When he was 14 years old, B.F. admitted having inappropriate sexual contact with a peer

18

while riding the school bus.  B.F.'s mother found pornographic material on B.F.'s Play Station portable video game when B.F. was 15 years old.  On another occasion, B.F. ordered sexually explicit movies at his mother's house, resulting in a $170 bill.  When he was 18 years old, B.F. smuggled pornographic photographs into juvenile hall and hid the photographs in his mattress.

The juvenile court concluded B.F. needed intensive therapy, including sexual offender treatment, in a structured environment which DJF could provide, and such treatment was the only way to achieve the goals of section 202 after other alternatives, including home and local out-of-home placements, had failed.  (*In re Robert M*., *supra*, 215 Cal.App.4th at p. 1186 [no abuse of discretion in issuing section 1752.16 housing order where juvenile court considered local alternatives].)  Substantial evidence in the record supports the juvenile court's conclusions.

B.F. relies on authorities discussing orders committing a ward to DJF.  (*In re Lorenza M*. (1989) 212 Cal.App.3d 49, 51; *In re Michael D*. (1987) 188 Cal.App.3d 1392, 1394.)  The Attorney General also cites cases involving that type of order.  The Attorney General recognizes this case involves a housing order, not a commitment order, but asserts the cited cases govern an order placing B.F. at DJF.

The decision of a juvenile court to commit a minor to DJF may be reversed on appeal only upon a showing that the juvenile court abused its discretion.  (*In re Lorenza M*., *supra*, 212 Cal.App.3d 49, 53.)  " 'An appellate court will not lightly substitute its decision for that rendered by the juvenile court.  We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them.  [Citation.]  In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " (*Ibid.*)

Even if the authorities B.F. cites are applicable here, the record contains substantial evidence that treatment at DJF would probably benefit B.F. and less restrictive alternatives would be ineffective or inappropriate.  (§ 734; *In re Lorenza M.*, *supra*, 212 Cal.App.3d at p. 58; *In re Teofilio A*. (1989) 210 Cal.App.3d 571, 576-579.)  The juvenile court did not abuse its discretion.

DISPOSITION

The judgment is affirmed.


                                                    MAURO                    , J.


We concur:


                     HULL                   , Acting P. J.


                     MURRAY              , J.