Filed 12/30/22  P. v. Berry CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GREGORY PECK BERRY,<br><br>    Defendant and Appellant. | C094651<br><br>(Super. Ct. No. 92F11142) |

Defendant Gregory Peck Berry appeals from the trial court's orders extending his civil commitment at Patton State Hospital, under Penal Code section 1026.5, until September 18, 2023.[1]  He contends substantial evidence does not support the court's finding that his mental illness causes him serious difficulty controlling potentially dangerous behavior, and that double jeopardy principles preclude retrial on the petition, which he argues should be dismissed.  We shall affirm the trial court's extension orders.

---

[1]  Further undesignated statutory references are to the Penal Code.

1

## I. BACKGROUND

Defendant was first committed to Napa State Hospital in 1994 after pleading not guilty by reason of insanity to multiple felony vehicular offenses after he led officers on a high-speed chase when they attempted to pull him over for erratic driving. Defendant later said that, at the time, he was in a "bad state of mind with his mental illness and he was making bad decisions," although he was unable to articulate the delusional beliefs underpinning his behavior that day.

Since his initial commitment, defendant has been released for outpatient treatment on a conditional release program (CONREP)[2] on several occasions, but each time the court revoked his release. He was first released to CONREP in 1996, but his outpatient status was revoked in 2003, and he was recommitted to Napa State Hospital. At the time, defendant had paranoid delusions that other patients were trying to rape him, and he also was using drugs and alcohol and went AWOL[3] from the treatment program.

He was released again to CONREP in 2004, but shortly thereafter was convicted of vehicular manslaughter while under the influence of drugs and alcohol after he caused an accident that killed a car salesman who accompanied him on a test drive. He was sentenced to 10 years in state prison, and the court later revoked his outpatient status and extended his inpatient commitment period. Thereafter, the court extended his commitment on three separate occasions for two years each time.

---

[2] CONREP is a statewide system of community-based services, provided by the California Department of State Hospitals, which treats patients with the following commitment types: not guilty by reason of insanity, incompetent to stand trial, mentally disordered offenders, and some parolees who have been released to outpatient status. (<dsh.ca.gov/Treatment/Conditional_Release.html> [last visited Dec. 27, 2022].)

[3] The term AWOL refers to an " '[a]bsence without leave.' " (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1108, fn. 2.)

Defendant was released to CONREP again in 2015, but the court revoked his release in 2017 for going AWOL. He had paranoid delusions that people were coming after him, which prevented him from attending his group sessions. The court ordered him back to Patton State Hospital for treatment under section 1026.5, and his maximum term of commitment was set to expire on September 18, 2019.

In February 2019, the Patton State Hospital medical director requested that defendant's commitment be extended. The following month the prosecutor filed a petition to extend defendant's commitment for an additional two years under section 1026.5. An exhibit to the petition included an affidavit from the medical director opining that defendant qualified for an extension of his commitment because, by reason of a mental disease, defect, or disorder, he represented a substantial danger of physical harm to others.

The petition exhibit also included a hospital case summary dated January 9, 2019, recommending a commitment extension. According to the summary, defendant presented an AWOL risk as he had previously gone AWOL from CONREP. Defendant also failed to recognize when he had hypomanic symptoms and continually asked for his medications to be reduced despite history showing that his medication helped him and that his manic symptoms increased when his medication was decreased. He had been diagnosed with Bipolar I Disorder, as well as a major neurocognitive disorder with behavioral disturbance due to a traumatic brain injury, alcohol use disorder, and antisocial personality disorder. Based on a violence risk assessment, defendant's risk for future violence in a structured, well-controlled forensic environment such as Patton State Hospital was low, but his risk for future violence and for inflicting serious physical harm during such violence were rated high if he were released to the community. Defendant lacked marked insight into his mental illness and how it related to past and future dangerousness. Defendant also had a history of violent and aggressive behavior towards other patients and staff since being hospitalized. While it seemed that defendant could

3

inhibit himself from physically striking others, he was unable "to inhibit his agitated verbal interaction-style," which often led other patients to hit him.

In August 2021, after multiple continuances, defendant waived his right to a jury trial and the matter proceeded to a two-day court trial.

At trial, Patton State Hospital forensic psychologist Mario Souza testified on the People's behalf as an expert in evaluating persons for not guilty by reason of insanity commitment extensions. Dr. Souza reviewed defendant's treatment records, contacted his treatment team, and interviewed defendant in February 2021. Although defendant cooperated during the interview and denied having current auditory hallucinations or delusional beliefs, he struggled to admit or recognize the delusional nature of his prior behavior, and he had a hard time verbalizing and describing his symptoms.

According to Dr. Souza, defendant suffered from Bipolar I Disorder (bipolar disorder) with psychotic features, which involved both manic and depressive phases with bouts of delusions and paranoid beliefs. His mental illness included mood aspects such as pressured speech, racing thoughts, irritability, and lack of sleep as well as psychotic delusions that others could read his mind, were plotting to sexually assault or poison him, and were following him. Such delusions had led to anger, hostility, and other fearful behaviors.

Dr. Souza opined that defendant's substance abuse disorder exacerbated his mental illness and contributed to an inability to refrain from or control dangerous behaviors by disrupting defendant's decision-making and behavior, and affecting the efficacy of his psychotropic medications. Defendant's alcohol and drug use had severely impaired him throughout his life, resulting in several driving under the influence convictions and leading defendant to engage in extremely dangerous behavior.

Based on his interview with defendant, Dr. Souza believed that defendant "stopped taking medications [on CONREP] because the drugs took the role of the medication." Although defendant identified external variables that could lead to his

4

abusing substances, such as being around others that use drugs or attending parties, he failed to recognize internal factors that had led to substance abuse in the past, such as stressors, emotional states, or other interpersonal variables. As a result, Dr. Souza did not believe that defendant had achieved a sufficient understanding of his substance abuse disorder so that he could mitigate the risk if released.

Defendant's major neurocognitive disorder, which he suffered as a result of being hit by a car as a child, impaired defendant's auditory learning, recall, and problem solving, and contributed to a low frustration tolerance. Dr. Souza explained that the neurocognitive disorder could lead defendant to make poor decisions, and when combined with his substance abuse and other negative behaviors, would ultimately exacerbate his bipolar disorder.

In Dr. Souza's opinion, defendant's mental illness continued to pose a substantial physical danger to others because he currently failed to acknowledge and understand how his severe mental illness impaired him. Because defendant lacked insight into his illness and how his symptoms affected his behavior in the past, he was vulnerable to the effects of his mental illness if he was not in a structured environment like the one Patton State Hospital provided. He did not currently understand what triggered his mental illness, potential warning signs or major changes to psychiatric compensation, or recognize when he let his behavior become guided by his mental illness. For similar reasons, Dr. Souza opined that, as a result of his mental illness, defendant also had serious difficulty controlling his dangerous behavior.

Dr. Souza also expressed concern that defendant believed he should be discharged into the community without supervision and that defendant claimed he had never been given a chance to show his ability on CONREP, even though he had been released unsuccessfully on four prior occasions. To Dr. Souza, this reinforced his opinion that defendant lacked sufficient insight into his illness and potential weaknesses if released. While defendant claimed he had family support, he also acknowledged that he had the

5

same support when each of his prior conditional releases were revoked. Thus, Dr. Souza did not consider defendant's family support a sufficient factor to mitigate his level of risk.

Although defendant was medication compliant in the hospital and showed limited severe mental disorder, he had not responded as well to the hospital's psychotherapeutic interventions given his lack of insight into his mental illness and what was necessary to discharge to the community. While medication compliance in the hospital was not necessarily an issue, in Dr. Souza's opinion, defendant did not understand what contributed to his past dangerous behavior. Simply because a patient is medication compliant and nonviolent in a structured hospital environment does not necessarily mean he or she will be compliant and nonviolent in the community or that the patient is ready for release.

In the 12 months prior to Dr. Souza's evaluation, defendant had not engaged in any violent behavior, although Dr. Souza noted that another patient reported fearing defendant because defendant repeatedly had been aggressive towards him. Since his return to commitment in 2017, the hospital had not had to use five-point restraints on defendant, nor had he been put on observation because he was a danger to himself or others.

While Dr. Souza agreed that defendant responded positively to his medication regimen, and that presently he would consider defendant's mental illness nearly in full remission, defendant still failed to recognize his prior delusional behavior even if he acknowledged making bad decisions in the past. This lack of insight into his illness was the primary basis for Dr. Souza's opinion that defendant continued to pose a substantial danger of physical harm to others and that he had serious difficulty controlling his dangerous behavior.

Defendant called a pastor, who was a longtime friend, to testify on his behalf. They spoke almost daily on the phone, and defendant now seemed to be in a calmer state

6

of mind. The pastor was aware defendant had a significant mental illness, and that he had engaged in criminal conduct that resulted in his commitment, but testified that if defendant were released, he would support and encourage defendant to attend counseling sessions and doctor's appointments.

Defendant testified that he had been diagnosed with Bipolar I Disorder with manic and psychotic features, as well as alcohol abuse. He endured a difficult childhood and started drinking to ease the pain from his father's physical abuse. He believed he was a "recovered addict" because he had not had any alcohol in over 17 years. He denied that his conditional release was revoked in 2017 partly due to alcohol, instead claiming that he became frustrated when CONREP took his large social security check so he stopped a police officer and asked to be sent back to Patton State Hospital. He further denied having paranoid delusions at that time that his ex-wife's former boyfriend was after him.

Defendant recognized that medication helped him make good decisions, and he testified that he would take his medication for life, including if he were released from the hospital. He acknowledged that he might become delusional if he stopped taking his medication. Defendant planned to live with his sister in Antioch, knew the location of doctors and a pharmacy, and would use his Social Security, Medi-Cal, and Medicare to cover the costs of those appointments.

Defendant was unaware of his mental illness in 2004 when he last used drugs and alcohol, but now he understood the seriousness of having a mental illness. He identified his early warning signs for a mental episode as agitation, worrying, loss of appetite, anxiety, and poor hygiene, but denied that delusions were a symptom of his mental illness. His triggers included hanging around bad places or people who encouraged him to use drugs, and even beer commercials. He would remove himself if he encountered any triggers and would try to read a book or do something positive instead.

When asked about his vehicular manslaughter conviction in 2004 while released to CONREP, defendant explained that he believed he saw someone with a gun trying to

7

carjack him during the test drive in a bad neighborhood, so he took off to get away and drove into oncoming traffic, causing an accident that killed the car salesman accompanying him. He had not taken his medication at the time, and he conceded that the man with the gun may have been a delusion.

Following the hearing, the trial court issued a written decision granting the petition to extend defendant's not guilty by reason of insanity commitment until September 18, 2023.[4] The court found that defendant suffered from a mental disease, defect, or disorder, and that as a result of that mental disease, defect, or disorder, he posed a substantial danger of physical harm to others, and had serious difficulty controlling his dangerous behavior. Defendant timely appealed.

## II. DISCUSSION

### A.   *Sufficiency of Evidence*

Defendant contends insufficient evidence shows that his mental illness *currently* causes him to be dangerous or to have serious difficulty controlling dangerous behavior. Specifically, defendant argues the prosecution's expert psychologist improperly based his dangerousness conclusions on mere speculation and past criminal conduct, but no evidence showed defendant was currently dangerous, presently encounters serious difficulty when trying to control dangerous behavior, or that his mental illness causes any alleged difficulty in controlling his behavior.

#### 1.   *The Trial Court's Ruling*

After recounting the evidence presented during trial, the trial court granted the extension petition, finding that the prosecution had proved beyond a reasonable doubt

---

[4] On August 13, 2021, the trial court signed two orders extending defendant's commitment. The first order extended his commitment from September 18, 2019, to September 18, 2021, and the second order extended his commitment from September 18, 2021, to September 18, 2023. Defendant appeals both commitment orders.

that because of defendant's undisputed diagnosed mental illness—bipolar disorder with psychotic features—he posed a substantial danger of physical harm to others and had serious difficulty in controlling his dangerous behavior. The court found that, although medically compliant in a structured hospital environment, the stressors defendant would face in an unstructured environment would either cause him to stop taking his medication or, alternatively, he would fail to seek appropriate care or intervention during a mental health episode because he lacked proper insight into the delusional component of his disease. In the court's view, defendant either denied or downplayed delusions as causing his past criminal and violent conduct during his testimony, which was consistent with Dr. Souza's observations of defendant when he assessed him.

The court distinguished *People v. Redus* (2020) 54 Cal.App.5th 998 (*Redus*), which defense counsel urged the court to follow in closing arguments. Unlike the defendant in *Redus*, the court noted that defendant was younger and had a history of violence with little insight into what might trigger that violence.

  2.  *Extending a Not Guilty by Reason of Insanity Commitment*

Section 1026.5 provides that a trial court may commit a person found not guilty of a felony by reason of insanity to a state hospital for a period no longer than the maximum prison sentence for his or her offenses. (§ 1026.5, subd. (a)(1).) The court may extend this commitment in up to two-year increments if, because of a mental disorder, the person both "represents a substantial danger of physical harm to others" (§ 1026.5, subd. (b)(1), (8)), and has "serious difficulty controlling his [or her] potentially dangerous behavior." (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 [explaining due process requires this "serious difficulty" requirement]; see also *In re Lemanuel C.* (2007) 41 Cal.4th 33, 40-41 [before extending a civil commitment for a dangerous youth, due process requires a finding "that a mental deficiency, disorder, or abnormality causes serious difficulty in controlling the person's dangerous behavior"; "the constitutional principles set forth in those cases [developing this requirement] apply to all civil commitment schemes"].)

9

Under the statutory scheme, a person's commitment may not be extended unless the trier of fact finds the necessary facts true beyond a reasonable doubt. (§ 1026.5, subd. (b)(4) ["The trial shall be by jury unless waived by both the person and the prosecuting attorney"]; *id.*, subd. (b)(7) ["The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings"].) " ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." ' " (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878.)

On appeal, we apply the substantial evidence test and examine the entire record in the light most favorable to the order. (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) We must consider whether any reasonable trier of fact could find, beyond a reasonable doubt, that defendant has serious difficulty controlling dangerous behavior because of his mental disorder. (See *ibid.*) "A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment." (*Ibid.*)

3.      *Analysis*

All parties agree that defendant has a mental disorder within the meaning of section 1026.5. They disagree on whether the evidence presented was sufficient to establish the present dangerousness and lack of control elements under the statute.

In this case, Dr. Souza gave a psychiatric opinion that defendant currently presents a substantial danger of physical harm to others given his bipolar disorder and suffers a volitional impairment rendering him dangerous beyond his control. Dr. Souza opined that defendant lacked critical insight into the nature of his mental illness and how it could negatively affect his behavior, especially outside the confines of a structured hospital environment. Defendant's failure to acknowledge that his delusions led to his criminal conduct, and, indeed, his denial that delusions were even a symptom of his mental illness, supported Dr. Souza's expert opinion regarding the fundamental lack of insight or

10

understanding. As Dr. Souza further noted, his neurocognitive and substance abuse disorders exacerbated his mental condition, making it even less likely that defendant would seek appropriate help or intervention if he began suffering delusional symptoms upon release into an unstructured environment thus posing a substantial danger to others that defendant could not control. This is substantial evidence supporting the extension of defendant's commitment.

While we do not necessarily disagree with defendant's argument that his prior criminal conduct *alone* may not establish that he currently has serious difficulty controlling dangerous behavior, defendant's delusional experiences in the past that led to dangerous criminal conduct, which violently harmed others and even killed someone, do shed light on *how* defendant responds when under stress in an unconfined environment. The fact that decades later defendant continues to deny or downplay the role delusions played in his violent and harmful conduct is relevant to show that he *currently* would be unable to control the danger posed by his mental illness when such delusions might again arise. As other courts have observed, " 'there may be "considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior." ' " (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370.)

Similarly, defendant's good behavior and medication compliance in the strictly controlled hospital setting does not preclude a finding that defendant is currently dangerous. The fact that a defendant can behave well in a controlled environment does not establish that he would not have substantial difficulty in controlling his dangerous behavior if released to an uncontrolled environment. (See *Williams, supra*, 242 Cal.App.4th at p. 875.)

Defendant relies on *Redus, supra*, 54 Cal.App.5th 998, but that case does not compel a different result. *Redus* itself acknowledged that a committed person's "lack of insight and continued delusions of the kind he or she suffered from at the time of the commitment offense can support a finding of continued dangerousness." (*Id.* at pp. 1012-

11

1013.)  And while the court in *Redus* found insufficient evidence to support the trial court's finding that the appellant's mental illness caused him serious difficulty controlling potentially dangerous behavior (*id.* at pp. 1009-1010), its basis for doing so is absent here.  In particular, *Redus* observed that the appellant was 73 years old and described by a psychology and risk assessment defense expert as a " 'fragile old man' " who was not "physically capable of taking action against an object of his paranoia even if he wanted to." (*Id.* at p. 1011.)  The appellant in *Redus* had not committed any violent act during his 45 years of commitment, and "there had not been a hint of violence, threatening behavior, or aggressiveness *of any kind* on the part of appellant over multiple decades, even through CONREP releases and medication lapses." (*Id.* at p. 1012, italics added.)

As the trial court here noted, defendant, at 50 years old, is much younger than the appellant in *Redus* and there was no testimony, expert or otherwise, that defendant was physically incapable of harming an object of his delusions or an innocent bystander. And, unlike in *Redus*, defendant has been violent or physically harmed others during his commitment.  While released on CONREP, he killed an innocent car salesman after his manic thoughts and delusions caused him to believe that someone was trying to carjack him.  Dr. Souza also testified that another patient in the hospital, who was not known to lie, reported being afraid of defendant who repeatedly had been aggressive toward him. And finally, unlike the defendant in *Redus*, no mental health expert testified on defendant's behalf that he did not pose a danger of harm to others.  Instead, both Dr. Souza and the medical director and treatment team of Patton State Hospital all opined that defendant's mental illness, which was exacerbated by his neurocognitive and substance abuse disorders, made him highly dangerous to others outside the confines of a structured hospital environment, and caused him serious difficulty in controlling potentially dangerous conduct.

12

We likewise find the other cases defendant cites unpersuasive. In *People v. Galindo* (2006) 142 Cal.App.4th 531, 536, 539, the appellate court found, based on *In re Howard N.* (2005) 35 Cal.4th 117, that the People were required to prove a committed person was unable to control his behavior, and that because neither the parties nor the court considered the control issue, reversal was required. But unlike *Galindo*, this case postdates *In re Howard N.*, and the parties and the court below squarely considered the volitional control issue. And while *People v. Bowers, supra*, 145 Cal.App.4th at pages 873-874, where the appellant had command hallucinations that she found difficult to control, and *People v. Zapisek, supra*, 147 Cal.App.4th at pages 1154-1155, 1166, where the appellant believed his delusions wholeheartedly and took inappropriate actions on his delusions while committed, may arguably present stronger sets of facts for extending a patient's commitment under section 1026.5, neither case establishes a minimum control threshold that must be met before a trial court may grant an extension request, nor do they mean insufficient evidence supports the court's extension orders here.

In sum, we conclude there was substantial evidence supporting the trial court's finding beyond a reasonable doubt that as a result of his mental illness, defendant currently poses a substantial risk of physical harm to others and has serious difficulty controlling potentially dangerous behavior. Viewing the evidence in the light most favorable to the court's extension orders, as we must, we cannot say that "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the court's findings. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *Williams, supra*, 242 Cal.App.4th at p. 872 [a single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify extension of commitment].)

B.    *Double Jeopardy*

In the event we find insufficient evidence supports the extension orders, defendant argues that double jeopardy principles prohibit retrial or further commitment extensions,

13

and he urges us to dismiss the petition.  Given our conclusion that substantial evidence supports the trial court's orders, we do not reach defendant's double jeopardy argument.

### III.  DISPOSITION

The trial court's orders extending defendant's commitment pursuant to section 1026.5 until September 18, 2023, are affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

MAURO, Acting P. J.

/S/

_____

KRAUSE, J.

14