Filed 5/14/24  In re Alexander C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ALEXANDER C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>ALEXANDER C.,<br><br>        Defendant and Appellant. | F087036<br><br>(Super. Ct. No. JW135560-07)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Wendy L. Avila, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

The People allege that in January 2020, Alexander C. (appellant), then 16 years of age, went to a park with fellow gang members and targeted a young couple they believed were associated with a rival gang. According to the People, appellant and another gang member approached the couple and fired multiple shots, killing one victim, and injuring the other.

Based on these allegations, the Kern County District Attorney's Office filed a juvenile wardship petition alleging first degree murder (Pen. Code, §§ 187, subd (a), 189; count 1) with gang-murder special circumstances (Pen. Code, § 190.2, subd. (a)(22)), willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a); count 2), and two counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); counts 3–4). The People also alleged enhancements for acting for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)), use of a firearm (Pen. Code, §§ 12022.53, subds. (d), (e)(1), 12022.5, subd. (a)) and personal infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)).

In September 2023, the juvenile court granted the People's motion to transfer appellant to a court of criminal jurisdiction pursuant to Welfare and Institutions Code section 707, subdivision (a)(1).[1] This appeal is taken from the transfer order. (See § 801, subd. (a).) We reject appellant's arguments that the juvenile court abused its discretion in ordering transfer. We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## BACKGROUND

### I.     Factual allegations.[2]

The alleged offenses occurred when appellant was approximately 16 years and 9 months of age.

On January 2, 2020, then 19-year-old E.Q. went to a park in Delano, California, to meet with his girlfriend, 19-year-old N.C. N.C. was a student at Fresno State University (Fresno State) and was wearing a red Fresno State sweater. E.Q. was wearing a Fresno State hat and red sandals. E.Q. denied being involved in a gang, and law enforcement had no reason to believe otherwise.

When E.Q. arrived at the park, he found N.C. sitting on some bleachers and gave her a hug. Approximately 30 seconds later, a car drove up. Appellant and another subject, K.G., exited the car. Appellant was armed with a .38-caliber pistol, and K.G. was armed with a .40-caliber pistol. A third subject, Jonathan Gutierrez, remained in the driver's seat with his head out of the window. The subjects approached and asked, " 'Where are you guys from?' " E.Q. responded, " 'I don't bang.' " Appellant and K.G. opened fire, striking E.Q. and N.C. multiple times. After the shooting, E.Q. heard one of the shooters say, " 'Fuck these fools.' " Appellant and K.G. then got back into their vehicle and fled the area.

Emergency personnel responded and found N.C. motionless underneath the bleachers. Lifesaving measures were attempted, but she died from her injuries.

E.Q. was transported to the hospital, where he received treatment for gunshot wounds to his legs. He was interviewed by law enforcement but was unable to identify the shooters.

---

[2]    This summary is drawn from the probation report on the behavioral patterns and social history of appellant (§ 707, subd. (a)(1)), the probation detention report (Cal. Rules of Court, rule 5.760(b)), and evidence produced at the transfer hearing.

Law enforcement located thirteen .40-caliber expended cartridge casings at the scene. They also obtained surveillance video from a nearby church. It shows a car appear to follow N.C. as she arrives at the park. The car circles the park until E.Q. arrives, then returns. Two subjects exit the vehicle and muzzle flashes can be seen. The subjects run back to the car, which then leaves.

Detectives observed the suspect car in the surveillance video appeared similar to a car they had seen parked outside of K.G.'s residence in McFarland. K.G. was known to be a Sureño gang member. Sureño gangs from McFarland have been involved in an ongoing, violent rivalry with Norteño gang members from Delano. Based on the location of the shooting, the way it was carried out, and the fact that the victims were wearing red clothing, law enforcement suspected the shooting was gang motivated. However, the investigation went "cold" because police had no additional leads.

In March 2021, a confidential informant disclosed to law enforcement that appellant, K.G., and Gutierrez committed the homicide. According to the informant, K.G. told him he was driving around with appellant and Gutierrez when they saw a female in the park and thought she was meeting up with a Norteño gang member. They waited for 10 to 15 minutes until a male subject arrived. Appellant and K.G. exited the car to " 'get off on them.' " Appellant's job was to keep lookout, but he was also armed with a firearm. K.G. told the informant that he " 'shot that hyna.' " Appellant told the informant that he fired his gun but did not know if he hit anyone.

The informant stated appellant and K.G. had just recently joined the gang. Prior to the shooting, other gang members told appellant that if he wants to " 'kick it with us in McFarland and be cool with us we got to see what you're about—You got to go slide.' "

In March 2022, when K.G. was in custody on an unrelated matter, officers contacted K.G. and provided him with photographs and other documents related to the investigation, including a summary of the informant's statements. K.G. was also given several documents "as a ruse," which the officers told him implicated him in the

shooting. The officers placed K.G. in a cell with other inmates and recorded their conversations. While speaking with the inmates, K.G. identified the other two people in the car as appellant and Gutierrez. He identified appellant as his " 'homie,' " and stated appellant was armed with a .38-caliber pistol during the shooting. When asked by other inmates whether the shooting was a drive-by or a walk-up, K.G. stated, " '[W]alk up.' " When asked who shot the female victim, K.G. said, " 'I know I did it.' "

K.G. was then interviewed by law enforcement. He claimed he was at the park with his friends when E.Q. drew a firearm, and that he shot in self-defense.

Six days later, Gutierrez was arrested and interviewed. He stated the shooting was K.G.'s idea and that he wanted to " 'put in work.' " He thought K.G. was only going to shoot the male but told him to stop when he saw he was also shooting the female. Gutierrez did not believe that appellant fired his weapon.

Appellant was arrested and interviewed on the same day as Gutierrez. He denied involvement in the shooting. Officers later searched appellant's residence and recovered gang-related photographs of appellant and gang clothing.

## II. Transfer hearing proceedings.

On March 14, 2022, the People moved to transfer appellant to criminal court. The motion was filed concurrently with the juvenile wardship petition.

Prior to the transfer hearing, the parties submitted briefs concerning transfer. The probation officer also submitted a detailed written report on the behavior patterns and social history of appellant pursuant to section 707, subdivision (a).

The transfer hearing was held in June 2023. N.C.'s mother testified for the People. She discussed how the alleged offenses impacted her and her family. She testified that N.C. attended Fresno State and was home visiting when she was killed.

The People also called a detective from the Delano Police Department who was involved in the investigation of the shooting. He described the ongoing violent rivalry between gangs in Delano and McFarland.

The defense called Michael Musacco, a psychologist regularly appointed by Kern County courts to perform evaluations. Musacco had previously been tasked with assessing appellant's trial competency in this matter. (See § 709.) He interviewed appellant and reviewed his medical, academic, and law enforcement records.

Musacco testified appellant was shot in the head in May 2020 and spent approximately one month in the hospital four months after the alleged offenses. He opined that appellant suffered a brain injury that has impacted his physical and cognitive functioning. Appellant's medical records showed he had weakness to one side of the body, and his school records indicated he had received special education services.

However, after interviewing appellant and administering diagnostic tests, Musacco also diagnosed appellant with malingering. Appellant provided inaccurate answers to simple questions, such as adding single digit numbers or identifying the shape of a ball. According to Musacco, even a person with a head injury would typically be able to answer these questions correctly. Moreover, appellant often gave "proximal answers," or answers that were very close to the correct answer, which is commonly seen in malingering. Musacco also spoke with several staff members at the juvenile detention center who informed him appellant was able to function normally, which was inconsistent with appellant's performance during the interview and on diagnostic tests.

Because of the malingering diagnosis, Musacco was unable to opine as to whether appellant should be transferred to criminal court. He concluded appellant likely experiences some legitimate impairment as a result of his brain injury, but due to appellant's malingering, he cannot determine the severity. However, he noted the malingering diagnosis suggests appellant was intentionally exaggerating his condition to avoid significant criminal consequences.

The defense also called Jennifer Crocker, a doctor who treated appellant for his brain injury in the hospital in May 2020. She described appellant's injury as a "penetrating traumatic brain injury" that damaged the right side of his brain. She opined

that appellant would have some long-term impairment to his coordination and memory. She also explained that due to appellant's youth, the injury may impact his natural maturation process.

Crocker testified that while the injury was severe, appellant was quickly able to recover motor skills and participate in rehabilitation at a higher level than anticipated. She recommended appellant continue rehabilitation after discharge but had no information on whether he received any follow-up treatment.

Finally, the defense called appellant's mother. She testified that she is a single mother with six children. Appellant has had no contact with his father since he was seven years old. Growing up, appellant's family experienced severe financial difficulties.

At the time of the alleged offenses, appellant lived with his mother during the week, but spent weekends at his sister's residence in McFarland. Appellant's sister lived with Gutierrez, one of appellant's alleged coparticipants.

Appellant was shot in the head on May 3, 2020.[3] Appellant's mother testified that after appellant returned home from the hospital, he had difficulties with memory and balance, became more sensitive, and was often slow to respond.

### III.    Juvenile court ruling granting transfer.

The juvenile court issued an order granting the transfer motion on September 19, 2023. After summarizing the factual allegations and circumstances of appellant, the court set forth the basis for its ruling on the record. It found that the prosecution had met its burden of proof as to each of the five factors set forth in section 707, subdivision (a)(3), and explained in detail how each factor weighed in favor of transfer. We summarize the court's findings and conclusions as to each factor below.

---

[3]    Appellant's mother told the probation officer that appellant was shot at a party during a drive-by shooting. However, according to the probation report, "[a]t least three other people have reported the gunshot wound was sustained accidentally when [appellant] shot himself."

### A. "The degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).)

The court observed appellant allegedly engaged in the premeditated and targeted murder and attempted murder of persons believed to be rival gang members. Each participant in the offenses had an assigned role. While appellant was supposed to act as the lookout, the evidence demonstrates he was also a shooter. Moreover, in committing the offense, appellant voluntarily chose to associate with gang members, and undertook the offense to demonstrate his loyalty to the gang.

The court noted that according to the probation report, appellant continued to associate with gang members after the shooting. Appellant also demonstrated his continuing loyalty to the gang by denying his gang affiliation to probation and refusing to discuss his relationship with other known gang members. In addition, during a search of his residence conducted after the shooting, probation located a firearm underneath his bed.

The court rejected appellant's argument that he acted under the influence of Gutierrez, who was older and was in a dating relationship with his sister. There was no evidence appellant was coerced, and all participants in the shooting appeared equally invested in committing a violent crime to benefit their gang and further their reputation within the gang.

The court also rejected appellant's claim that his brain injury weighs against transfer due to his limitations. While it is clear he suffered from a traumatic brain injury, his malingering with Musacco showed he intentionally exaggerated his condition to avoid the negative consequences of his criminal conduct. Therefore, the court found this factor weighed in favor of transfer.

**B. "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).)**

The court began by considering the amount of time appellant could remain under the jurisdiction of the juvenile court. Juvenile jurisdiction would expire when appellant reaches 25 years of age. (See § 607, subd. (c).) At the time of the transfer hearing, appellant was approximately 20 years and six months of age. Thus, appellant could only remain under the juvenile court's jurisdiction for another four and a half years.

The probation report stated if appellant were to remain under juvenile court jurisdiction, the only potentially appropriate option would be to commit him to the Achievement, Perseverance, and Excellence (APEX) Academy, Kern County's secure facility for juvenile offenders. It explained that if the allegations in the wardship petition were found true, the baseline term would be four to seven years. (See Cal. Rules of Court, rule 5.806(d).)

Given the amount of time appellant would have under juvenile court jurisdiction, the court observed it could only impose the minimum baseline term. The court concluded that this would be insufficient to rehabilitate appellant, given the circumstances of the case and appellant's "deep-seated issues." The court also noted appellant has not accepted responsibility for his conduct or shown a desire to change. He continues to demonstrate loyalty to his gang, abiding by the "gang code of silence" and refusing to discuss his well-documented gang affiliation. He has a long history of substance abuse, criminal conduct, and violating probation. Considering this extensive history in conjunction with "the issues of trauma experienced from two parents with substance abuse issues, poverty, and instability in housing," the court concluded that appellant's needs "extend beyond what the juvenile court can provide." The court found this factor weighed in favor of transfer.

9.

### C. "The minor's previous delinquent history." (§ 707, subd. (a)(3)(C)(i).)

The court observed that the instant matter is appellant's eighth juvenile wardship petition. His delinquency history dates back to 2015, when the initial wardship petition was filed. The court briefly summarized the circumstances of each petition: punching his brother and possessing marijuana at school; theft from a friend's house; shoplifting and punching another student at school; violating probation by failing to complete juvenile court work program hours and using marijuana; violating probation by failing to report to his probation officer, attend school, or attend anger management classes, and possessing illegal substances; violating probation by failing to report to probation and using marijuana; and violating Penal Code section 148, subdivision (a)(1) by fleeing when probation officers arrived at his residence to conduct a probation search, which led to the discovery of a firearm underneath his bed. Appellant also had other matters that were handled informally with probation that did not result in the filing of additional petitions. In addition, the court found appellant consistently disregarded court orders and failed to make any significant attempt at rehabilitation. Accordingly, the court found this factor weighed in favor of transfer.

### D. "Success of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(3)(D)(i).)

The court began by summarizing the programs and services appellant has received since he entered juvenile court jurisdiction in 2015. Appellant has received "wraparound services," the juvenile court work program, multiple stints at the youth detention center, numerous referrals for counseling, and has been supervised by multiple probation officers. The court found appellant has consistently refused to obey court directives and attend programming, failed to comply with terms of probation and attend school, and continued to use drugs and associate with gang members.

The court stated appellant is currently housed at the youth detention center in the highest security level, where his behavior is described as "fair." Appellant has made

some recent progress while in juvenile detention, showing the ability to abide by the rules and participate in some programming. However, the court found appellant still fails to demonstrate self-reflection, in that he refuses to take responsibility for his choices, show empathy to others, or speak about his gang involvement. In addition, appellant's malingering with Musacco shows he is willing to deceive and manipulate to avoid consequences for his criminal conduct, which is "not indicative of someone who has truly embraced change and rehabilitation." The court found this factor weighed in favor of transfer.

### E. "The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(E)(i).)

The court noted appellant is alleged to have committed murder and attempted murder, personally discharging a firearm, and acting for the benefit of his criminal street gang. It described the allegations against appellant as "the most serious of all offenses." Thus, the court found this factor weighed in favor of transfer.

## DISCUSSION

### I. The juvenile court did not abuse its discretion in ordering transfer of jurisdiction to criminal court.

Appellant contends the juvenile court should have denied transfer based on various factors, such as his difficult upbringing, brain injury, and recent progress in juvenile detention. He also argues there was insufficient evidence that available programs for juvenile offenders were unlikely to result in his rehabilitation before the expiration of juvenile court jurisdiction. We disagree.

### A. Standard of review.

When the People move to try a juvenile offender as an adult, the juvenile court must conduct a transfer hearing in accordance with section 707, subdivision (a). (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303.) At the transfer hearing, the burden is on the People to establish "by clear and convincing evidence that the minor is

11.

not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); see Cal. Rules of Court, rule 5.770(a); *In re E.P.* (2023) 89 Cal.App.5th 409, 416.)

In determining whether transfer is warranted, the juvenile court must consider five criteria: (1) "The degree of criminal sophistication exhibited by the minor"; (2) "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "The minor's previous delinquent history"; (4) "Success of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)–(E).)

We review a juvenile court's order granting transfer for an abuse of discretion. (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 714 (*J.N.*).)

### B.     An abuse of discretion did not occur.

Appellant recites various aspects of his personal circumstances, contending they demonstrate the juvenile court's order granting transfer was an abuse of discretion. First, he notes that he grew up in an impoverished home, never had a positive male role model in his life, and witnessed his father physically abuse his mother. Next, he states his brain injury has had a significant impact on his life. Finally, he argues he has shown recent improvement while in juvenile detention, including positive behavior and progress in counseling.

We agree that the above circumstances weigh against transferring appellant to criminal court. But our role on appeal is not to rehear the transfer motion. Rather, our charge is to determine whether the juvenile court's ruling was an abuse of discretion, in that it was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

As described above, the court thoroughly explained the basis for its ruling on the record, describing in detail why each criterion weighed in favor of transfer. The court

relied on many compelling circumstances, including the nature and sophistication of the alleged offenses, appellant's extensive delinquent history, his repeated failures to comply with court directives or make efforts at rehabilitation, and the limited time he could remain under juvenile court jurisdiction. The record also shows the court considered the circumstances recited by appellant.

Having reviewed the record in its entirety, we conclude the court's ruling was not irrational or arbitrary. The court applied correct legal standards and considered all the relevant circumstances set forth in section 707, subdivision (a)(3). While the circumstances cited by appellant weighed against transfer, the court concluded, based on the totality of the circumstances, that transfer was appropriate. Given the considerable evidence weighing in favor of transfer, the court's ruling was reasonable. Thus, the court did not abuse its discretion in ordering transfer.[4]

### C. Substantial evidence supports the court's finding appellant could not be rehabilitated prior to the expiration of juvenile court jurisdiction.

Appellant contends the juvenile court's conclusion that there was insufficient time to rehabilitate appellant was not supported by substantial evidence, and therefore was an abuse of discretion. (See *J.N.*, *supra*, 23 Cal.App.5th at p. 714.) He relies on *J.N.*, where

---

[4] Respondent argues that recently enacted Senate Bill No. 545 (2023–2024 Reg. Sess.) (Stats. 2023, ch. 716, §§ 1–4) does not require remand. Effective January 1, 2024, this bill amended section 707 to require that the juvenile court "shall give weight to any relevant factor" listed therein. (§ 707, subd. (a)(3).) It also added new mandatory factors for the court to consider, including "the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

Appellant does not mention Senate Bill No. 545 (2023–2024 Reg. Sess.) in his opening brief and does not address respondent's arguments in his reply brief. We therefore deem any related claim waived and need not address the matter further. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

the juvenile court relied solely on the probation officer's opinion that the minor could not be rehabilitated under juvenile court jurisdiction. (*Id.* at p. 721.) *J.N.* criticized the probation officer's opinion as conclusory and lacking evidentiary support, noting it was offered "without any analysis." (*Ibid.*; see *id*. at p. 722.) In holding the juvenile court's finding was not supported by substantial evidence, *J.N.* concluded "[t]here was no evidence as to the efforts necessary to rehabilitate [the minor] and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted." (*Id.* at p. 722.)

Appellant argues that here, as in *J.N.*, there was no evidence that appellant could not be rehabilitated in time, because the probation report did not explain why programs and services at APEX Academy would be inadequate. This argument is not supported by the record. The probation report described the programming available at APEX Academy, including mental health treatment, substance abuse treatment, and individual and group therapy. It then noted that appellant has previously been provided similar services on numerous occasions, but his propensity toward violence and criminal sophistication has still increased. Given appellant's lack of self-reflection and extensive history of criminal behavior, gang affiliation, substance abuse, and violations of probation, the report concluded there was insufficient time to rehabilitate appellant at APEX Academy, stating: "It will take a significant amount of time and treatment to build rapport, get [appellant] to be open and honest, help him identify his behaviors and thinking errors, accept the need for change, and to provide effective treatment in order for him to successfully rehabilitate. Based on the above, a commitment to the APEX Academy would appear to fall short of what the subject requires in order to rehabilitate in terms of treatment and length." Therefore, unlike in *J.N.*, the probation report's opinion was not merely conclusory. Rather, it was based on compelling evidence that appellant could not be adequately rehabilitated under juvenile court jurisdiction.

In addition, the court did not rely solely on the probation report, but explained its basis for concluding the evidence showed appellant cannot not be timely rehabilitated. The court was persuaded by appellant's failure to accept responsibility for his actions or show a desire to change, as demonstrated by his malingering and continued loyalty to his gang. It also considered appellant's long history of delinquency and personal issues related to his difficult upbringing.

Appellant argues that the trial court placed undue weight on the fact that juvenile jurisdiction for appellant would end at age 25, because section 1800, subdivision (a), "permits the prosecutor to petition for an extension of juvenile court jurisdiction, even past the age of 25." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 93.) To obtain such an extension, the People must prove that the subject "would be physically dangerous to the public because of the [subject's] mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior." (§ 1800; see § 1801.5.)

We do not agree the existence of this procedure was relevant to the juvenile court's determination that appellant cannot be timely rehabilitated. Section 1800 only applies where the subject has a mental disorder causing the inability to control dangerous behavior. (§ 1800; see *In re Lemanuel C.* (2007) 41 Cal.4th 33, 45.) It is not, as appellant claims, a "built-in safeguard" if appellant still represents a danger to the public when he reaches the age of 25. Nothing in the record suggests appellant suffers from a mental disorder that *causes* him to be dangerous. Thus, the court had no basis to believe juvenile court jurisdiction might be extended on this basis.

Based on the record before this court, we conclude the juvenile court's determination that appellant cannot be rehabilitated prior to the expiration of the juvenile court's jurisdiction was supported by substantial evidence. Accordingly, an abuse of discretion did not occur, and this claim lacks merit.

# **DISPOSITION**

The juvenile court's order transferring appellant to a court of criminal jurisdiction is affirmed.

LEVY, Acting P. J.

WE CONCUR:


DETJEN, J.


SMITH, J.